WILLCOX v. GOESS (FIRST NAT. BANK & TRUST CO. OF ROCHESTER, Intervener).

Nos. 369–375.

Circuit Court of Appeals, Second Circuit.
July 19, 1937.

Morris Ehrlich, of New York City (Bernard H. Nearman, of New York City, on the brief), for trustee in bankruptcy.

Bernard Sobol, of New York City, for receiver of defendant bank.

George B. Rice, of Bayside, L. I. (P. D. Oviatt, of Rochester, N. Y., of counsel), for First Nat. Bank & Trust Co. of Rochester, intervener.

Conboy, Hewitt, O'Brien & Boardman, of New York City (Bernard Sobol, of New York City, of counsel), for receiver of Harriman Bank.

Before L. HAND, AUGUSTUS N. HAND, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These appeals are from decrees in a consolidated suit to recover upon a bank account, and to set aside a number of transfers alleged to have been preferential, not under the Bankruptcy Act—since all were more than four months before petition filed—but under section 15 of the New York Stock Corporation Law (Consol.Laws, c. 59). The plaintiff is the trustee of a corporation called, "J. A. M. A. Realty Corporation," of which Harriman, the president of the Harriman National Bank and Trust Company, and his wife, Augusta, owned all the twenty thousand shares except eight held by their daughter, Miriam. This corporation was originally organized to hold real estate, but

gradually its activities were enlarged and at the time of the events here in question Harriman used it among other things as a conduit for his operations in the Bank's shares. He treated it substantially as his own, and much of the resulting confusion arises from the extent of the powers which he so assumed. The Bank, as its name implies, was a national banking association, over which Harriman also exercised almost as absolute a control, with a corresponding entanglement of legal relations. The Comptroller declared the Bank insolvent and appointed the defendant its receiver on October 16, 1933; the plaintiff was later appointed trustee in bankruptcy of J. A. M. A. and brought seven separate suits against the receiver, later consolidated and tried together; it will be more convenient to deal with the facts in each when we take them up seriatim. The First National Bank & Trust Company of Rochester intervened in Suit No. 3, claiming a lien upon the property there in dispute; it has no other interest in the litigation. The judge gave the trustee a decree in Suit No. 1, but dismissed all the other bills against the receiver, including the claim of the Rochester bank in Suit No. 3. The trustee has appealed in all seven suits, though in Suit No. 1 from that part only of the decree which held that J. A. M. A. owed the note which had been preferentially secured. The receiver has appealed in Suit No. 1 from the decree declaring the transfer there involved a preference. The Rochester bank has appealed from the decree in Suit No. 3.

## Suit No. 1.

■ This suit is to set aside the preferential transfer of miscellaneous property by J. A. M. A. to the Bank on July 25, 1932, made as security for a note of $100,000. This collateral consisted of a miscellaneous assortment of works of art, valued by the judge at $100,000; the "High Farm property," $6,900; the "West Orange mortgage," $15,000., and two hundred of the Bank's shares. Two questions arise: whether the transfer was a preference under section 15 of the New York Stock Corporation Law; and whether J. A. M. A. owed the Bank the debt for which it was security. First, as to the debt. On December 7, 1931, Harriman wanted to get cash into the hands of the Harriman Securities Corporation in order to pay the coming dividend on its shares. Burke, the Bank's comptroller, on behalf of Harriman,

got one Levin to sign a note for $100,000, with the proceeds of which Levin was to buy from Harriman two hundred of the Bank's shares, which should be used as security for the note. Harriman was to take these back at the same price after six months, and give Levin five shares as a bonus. Levin cashed the cheque, and Harriman deposited the proceeds in J. A. M. A.'s account with the Bank to pay loans which he owed to it. The shares were apparently set aside for Levin, and perhaps used as security for the loan, though this is not clear, and is immaterial anyway. J. A. M. A. at once paid the same sum to the Securities Corporation, in discharge of its own debts, and the Securities Corporation used this and other money to pay its dividend. The note was pretty clearly a sham. In December, 1931, the shares were being quoted for about $1,-400, and two hundred would have cost nearly $300,000. It is incredible that Harriman should have really meant to give them to Levin, a stranger, at one-third their value with a boot of five shares thrown in. Harriman was engaged in "boosting" the shares, and the transaction was surely not a sale at five hundred dollars. On the other hand, if it was not, it is improbable that Levin should have borrowed $100,000 from the Bank merely to let Harriman have the use of it on Harriman's personal undertaking, even though backed by the shares as security and with the bonus. At least it was a very curious transaction, which lent itself much more readily to the interpretation that Harriman, who had exceeded his borrowing limit with the Bank, adopted this means of misappropriating its funds. Moreover, the parties always treated the note as a sham. J. A. M. A. paid the interest upon it, and Burke told Levin to disregard the notice sent to him when the principal fell due. As soon as Cooper, the new president, who had come in in July because of Harriman's misconduct, learned the facts, he at once assented to Levin's disclaimer of liability, returned it and marked it "paid" on the Bank's books. We agree with the finding below that it was void.

If so, Harriman having misappropriated the Bank's funds and paid his debts to J. A. M. A. with them, J. A. M. A. became liable to it under the docrine of Munroe v. Harriman, 85 F.(2d) 493 (C.C.A.2). We there held that, although a principal is not charged with his agent's knowledge

while engaged in a fraud upon him, if the principal must avail himself of a transaction entered into by the agent on his behalf, the guilty agent's knowledge will be imputed to him. In that case Harriman had stolen Munroe's securities and pledged them with the Bank; we held that, as the Bank could keep them only as a purchaser, and as Harriman had acted as its agent in taking them as security, it was charged with his knowledge of his own theft. So here J. A. M. A. can keep the money which Harriman embezzled from the bank only if it was a bona fide purchaser. A purchaser it was, because Harriman used the money to pay his debts; but bona fide it was not, for it must resort to the payment to be a purchaser at all, and it was Harriman who directed how the funds deposited should be used. Thus J. A. M. A. was under an antecedent obligation of which its own note was merely a new form, and it is a valid claim.

■ J. A. M. A. was insolvent on July 25, 1932, in the sense that its assets were less than its liabilities; so much is now conceded. But that sort of insolvency will not answer the requirements of section 15; the debtor must have defaulted upon its obligations in due course, or default must be "imminent." Brouwer v. Harbeck, 9 N.Y. 589; Abrams v. Manhattan Consumers' Brewing Co., 142 App.Div. 392, 126 N.Y.S. 844; Childs v. County Trust Co. (D.C.) 6 F.Supp. 821, affirmed 70 F.(2d) 1012 (C.C.A.2). The drop in value of the Bank's shares had been such that J. A. M. A. could not conceivably hope to keep out of bankruptcy or some other insolvency proceeding, though just when it must default, might still be uncertain. Indeed, strictly speaking, it had already defaulted, because, although Cooper did not demand payment of the underlying obligation, the note was not properly a renewal of Levin's note; it was tabula in naufragio. This is shown by the character of the collateral, and by the fact that it was made up of all J. A. M. A.'s unencumbered assets except the Bank's own shares. Perhaps Cooper did not know the last, but he knew that the collateral was most unusual for a bank; moreover he must have known that J. A. M. A. was a family company of Harriman's; he had just learned that Harriman had in this very transaction misappropriated the Bank's funds; he knew of the collapse in the shares. And aside from that he knew that J. A. M. A. could not pay at the time, which was the important information under section 15, because the insolvency and the notice of insolvency must be parallel.

■■ Indeed, the receiver's main reliance is not that the Bank was not charged with notice of insolvency, but that there were other debts which J. A. M. A. owed the Bank, the dividends on which may be set-off against any recovery, though they were not proved in J. A. M. A.'s bankruptcy and are now barred. We cannot agree. It is true that a creditor will be allowed to prove on the preferred debt after the statute has run against it, even though surrender of the preference has been forced. Keppel v. Tiffin Savings Bank, 197 U.S. 356, 25 S.Ct. 443, 49 L.Ed. 790. Moreover, the result will be worked out by setting off the dividend in the preference suit itself. Page v. Rogers, 211 U.S. 575, 581, 29 S.Ct. 159, 53 L.Ed. 332; Larkin v. Welch, 86 F.(2d) 442 (C.C.A.7). But we know of no decision holding that when the creditor has allowed the bar of section 57 (n), Bankr. Act (as amended, 11 U.S.C.A. § 93 (n), to fall against other debts, he may set off the dividends upon these also against the recovery of the preference. Nor can we conceive that it is any reason, legal or equitable, why he should be relieved of the bar, that he has tried to take an unfair advantage over his fellows and has been compelled to disgorge. We may assume that a creditor must surrender all preferences in order to prove on any debts whatever which exist at the time of the preference (In re Dix [D.C.] 267 F. 1016); but that does not affect the scope of section 57 (n). The only excuse for allowing the creditor to prove at all upon the claim which has been preferred, is the injustice of compelling him to choose between forfeiting his dividend and trying out his right to keep the security. It was not inevitable that he should have that choice; section 57 (n) does not clearly require it; but there is no justice in extending it beyond the preferred claim, as to which alone the predicament exists. In the case at bar we do not forget that J. A. M. A.'s note pledged the property not only for itself—$100,000—but for "all other liabilities," and that it then owed the Bank $345,000 more; or that the judge has found the value of the security on August 2, 1934, the last day to prove claims, as about $122,000—made up of $100,000 for the works of art; $6,900 for the "High

Farms" property; and $15,000 for the "West Orange" mortgage. But it is absurd to suppose that the Bank failed to prove claims of over $600,000 because it relied upon this supposititious surplus of $22,000, which in fact turned out to be a deficiency anyway.

Finally, it is true that at times when the debtor and the creditor have had a running merchandise account, begun after the debtor is insolvent, and ending in an enrichment of the estate, payments made upon the account are not treated as preferences. Jaquith v. Alden, 189 U.S. 78, 23 S.Ct. 649, 47 L.Ed. 717; Yaple v. Dahl-Millikan Grocery Co., 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776; Wild v. Provident Trust Co., 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003; In re Fred Stern & Co., 54 F.(2d) 478 (C.C.A.2). The doctrine is somewhat anomalous at best, and can be defended in principle only by the fiction of treating all items of the account as one and the payment as therefore subject to set-off of the dividends payable on all. Even that will not serve unless the dividends exhaust the preference. Whatever the explanation of the doctrine, there is no room for its application here. In Ely v. Greenbaum, 85 F.(2d) 501 (C.C.A.2), we treated the payment as in fact made upon all the debts, whose dividends were set off.

## Suit No. 2.

This suit concerns a transfer made by J. A. M. A. on October 13, 1931, of three pieces of property: (1) the "Brookville mortgage" (of the face amount of $325,000 at 5½%, valued by the court at $275,000); (2) some shares of stock in a cooperative apartment corporation—1170 Fifth Avenue; (3) the lease of an apartment in the same building. Neither of the last two had any value. The question is whether the transfer was voidable under section 15 of the Stock Corporation Law. The trustee's argument is that Harriman never meant finally to part with the property, but only to use the assignment as a screen. Also that if he intended to make it definitive, neverthless it was a preference, because J. A. M. A. was then insolvent, or its insolvency was imminent. The assignment was formal, regular and absolute; so far as appears, it was always kept in the bank's files, though no entry was ever made of it in J. A. M. A.'s books, and it was not recorded for a year. It secured a present advance of $195,000, and an earlier loan of $150,000, on which the national bank examiners had demanded some collateral. In support of the argument that it was a sham assignment it is to be noted that it was never entered in the Bank's collateral loan register until it was recorded, that the mortgagor was never notified, and that the fire insurance policies were never changed. These were certainly suspicious circumstances. Moreover, a bank examiner, one Francis, in December, 1931, made a report in which the "Brookville mortgage" appeared as primarily pledged to the Securities Corporation, the Bank having only an equity in it; though Francis could not remember why he had so reported it. On the other hand, a memorandum of collateral in the possession of the Bank's discount clerk dated November 17th, and another dated January 13th, both declared that the mortgage was security for the notes. (Although these memoranda were initialled "J. W. H.," that need not have meant that the securities were pledged on Harriman's loan, and the discount clerk denied that it did.) Again, the Bank's appraiser appraised it on October 22nd; and on November 14th, J. A. M. A.'s bookkeeper, Hughes, wrote a letter to the Bank about it, stating the outstanding insurance policies. The auditors for the Bank's directors reported that they found it attached to the note for $150,000; the Clearing House examiner, Hanna, reported the same thing. Finally, Francis in a report of June 20, 1932, showed that the loans were then at any rate so secured. It is of course possible that Harriman secretly wished to withhold any irrevocable record, so as to be able to shuffle the assignment about as he pleased; but in order successfully to question a document fair on its face, there must be more than that. The intent of the parties is to be found in their expressions, and these were unequivocal enough. Such flotsam and jetsam as we have to the contrary are too dubious to justify our upsetting a finding based upon appearances formally invulnerable. If it was what it purported to be, the much overworked decision in Benedict v. Ratner, 268 U.S. 353, 45 S.Ct. 566, 69 L.Ed. 991, did not invalidate it. J. A. M. A. was not authorized to collect and disburse any of the principal, and it is well settled in New York that a mortgagor may collect the rents—even when as here the mortgage assigns it—until the mortgagee has taken possession or got a receiver.

Sullivan v. Rosson, 223 N.Y. 217, 119 N. E. 405, 4 A.L.R. 1400; In re Prudence Co., 88 F.(2d) 420 (C.C.A.2).

The mortgage or pledge was therefore valid, unless it was a preference under section 15 of the Stock Corporation Law. J. A. M. A.'s insolvency was not "imminent" on October 13, 1931; none of its obligations were due until December and they were then renewed until the summer. Moreover, it could pay; its assets were enough to meet its debts; we are not to judge it by what happened during the next nine months. The trustee insists that its creditors had been misled by a statement issued to them at the end of December, 1931, with the connivance and complicity of the Bank. But that was no more than a balance sheet of assets and liabilities, and as such it was correct; it did not profess to distinguish between free and encumbered assets, and it could not be false. It may, indeed, have been inadequate, but that was a defect to be corrected at the demand of those to whom it was shown, if they wished more.

### Suit No. 3.

In this suit the trustee seeks to recover the proceeds from the sale of a piece of real property—20 East 54th Street, in the City of New York. J. A. M. A. had owned this property, subject to a mortgage, and on October 13, 1931, Augusta Harriman, the owner of 11,352 of its 20,000 shares, executed, as vice-president, a deed to the Harriman Securities Corporation. Harriman was the prime mover, and the deed was delivered as security for a loan of $400,000 made to J. A. M. A. the same day. This loan was completely paid by December 31, 1931, and the deed redelivered; but on March 21, 1932, the Securities Corporation again lent $50,000 and another $50,000 on April fourth; and the deed was redeposited as security on March twenty-fourth. While these two loans were still outstanding, the Securities Corporation delivered the deed to the Bank, at the same time executing to it a warranty deed, purporting to convey all its interest in the premises. These documents were delivered as security for Harriman's personal debts, and probably were also security for J. A. M. A.'s debts, because of a much earlier resolution that all its property held by the Bank should always be such security. The questions which these facts raise are two: first, whether the deed was a mortgage, originally valid as to its factum; and if so, whether it secured any other loan than the original $400,000 of October 13, 1931. Second, if it was and did, whether it was either a fraudulent conveyance, or a preference under section 15 of the New York Stock Corporation Law. If it was invalid for either reason, a second controversy arises between the trustee and the First National Bank & Trust Company of Rochester, a judgment creditor of J. A. M. A. as of November 16, 1932.

The first question is whether the mortgage was executed in compliance with section 16 of the New York Stock Corporation Law. In spite of the particular and stringent provisions of that section requiring either a shareholders' resolution ad hoc, or their written and acknowledged consent, the courts of New York have somewhat relaxed the text; and we have tried to follow, though sometimes with uncertain steps. In re Post & Davis Co., 219 F. 171, we refused to accept later parol ratification by the shareholders; on the other hand in Re Constantine Tobacco Co. (C. C.A.) 290 F. 128, where the holder of all the shares executed the mortgage, and there had been in addition a shareholders' resolution, we thought these enough; while in Re Victoria Fusilli Co., 79 F.(2d) 611, we extended the exception to include a prior consent not in writing; acknowledging our doubts, but feeling justified by decisions of the New York courts. It must be owned that these rulings have made very free with the words of the act; and—though we do not wish to retract—we deem it a minimum condition that the required number of shareholders shall personally consent to each mortgage, and that they shall not attempt to delegate their power —perhaps the same thing. This we are holding in the companion case of In re J. A. M. A. Realty Company (C.C.A.) 92 F.(2d) 3, handed down herewith.

We will assume arguendo that, because of its execution by Augusta Harriman, who owned more than one-half the shares, and because of its procurement by her husband, the deed was a valid security for the original loan of $400,000. That loan was paid, as we have said, and the deed was returned on December thirty-first. The parties might probably have kept the lien alive by express consent, even after that (Salvin v. Myles Realty Co., 227 N. Y. 51, 56, 124 N.E. 94, 6 A.L.R. 581); though there must be a specific contract expressly to that effect (Bogert v. Bliss,

148 N.Y. 194, 42 N.E. 582, 51 Am.St.Rep. 684); but there is nothing in the record to show that they did so. It is therefore a little hard to see how the two loans by the Securities Corporation of March twenty-second and April fourth were secured, in spite of the redelivery of the deed. But we are not concerned with these; the question is of the mortgage to the Bank. The form chosen for that was a conveyance by the Securities Corporation of the lien without the debt, and it is well settled that in general that is unavailing, since the lien is merely an appurtenance. We will nevertheless arguendo ignore the form of the transaction, and look at it as a whole and to its underlying intent. The Bank was to have the property as security for Harriman's personal debts, and J. A. M. A. later substituted other security with the Securities Corporation. However, if that intent was so manifest that the form made no difference, what happened was in substance that the Securities Corporation reconveyed to J. A. M. A., and J. A. M. A. mortgaged the property to the Bank; and if that had all been written out, the defect would have been evident at once. Unless the mortgage was authorized as the statute required, no lien arose. Equity may, and indeed should disregard form; but equity may not, any more than law, disregard the conditions imposed by statute upon the substance of a legal transaction. This was a mortgage against whose creation by ordinary means the legislature had interposed conditions which no court might disregard—in equity as little as at law. Indeed, the record does not even show that Augusta Harriman knew that she was executing a mortgage in the first place; Hughes, the bookkeeper, merely said that he gave her the deed without explanation and that she signed it; doubtless she would have signed whatever her husband told her to. Be that as it may, on no conceivable theory did she consent to the mortgage to the Bank. Nor will the resolutions of January 26, 1923, and November 17, 1924, answer the requirements; they did indeed authorize Harriman to "pledge" any property of the Company and to borrow at will, but section 16 was directed exactly against such an omnibus authority; the meeting of shareholders must be called "for such purpose," that is, to consent to a specific mortgage, not to mortgages in general; nothing else will give that protection which was thought necessary. Thus the mortgage was void as to its factum, and was a nullity. Leffert v. Jackman, 227 N.Y. 310, 125 N.E. 446; In re James, Inc., 30 F.(2d) 555 (C. C.A.2). As the proceeds from the sale of the property are less than the lien of the Rochester bank, the bank takes all. The trustee makes an elaborate argument, designed to preserve the transfer on behalf of the estate, after setting it aside as against the receiver. We need not consider it, for it presupposes that the mortgage was validly executed; and since in our judgment it was no more than an idle paper, there was nothing to preserve. We do not mean to intimate that the argument would have been good anyway.

### Suit No. 4.

This and Suits Nos. 5 and 6 are properly actions at law to recover upon J. A. M. A.'s deposit account in the bank. The controversy arises over the debits with which the Bank charged the account, there being no question about the credits. In all but two instances—when "debit slips" were used—these debits were asserted as payments through cheques drawn by Harriman and to his order, usually directly deposited to his personal credit in the Bank, and always in effect borrowed from J. A. M. A. Long before any of the withdrawals here in question—on January 26, 1923—J. A. M. A. had passed a resolution giving Harriman the most comprehensive powers, and among other things authorizing the Bank to accept cheques for deposit to his individual credit, and even in payment of his obligations. So far as this resolution was valid, it therefore protected the Bank in accepting a cheque to the credit of Harriman's account though drawn by him and to his order. The authorities are not in harmony as to whether a bank may safely accept or pay cheques drawn to an agent's, or fiduciary's, order by himself; but obviously the principal may expressly authorize it to do so. That was the case here. The only doubts arise from the fact that J. A. M. A.'s charter forbad its lending without security, and that section 59 of the New York Stock Corporation Law forbad its lending to a shareholder. We will assume that even a bank acting under such an authorization, may not debit its depositor's account with a withdrawal, if it actually knows that the agent means to misappropriate the proceeds; but certainly that liability must depend upon notice of the agent's purpose.

In the case at bar the Bank had no actual notice of the limitations of the charter, or of the statute; at least none is shown, and to succeed the trustee must impute such notice. No knowledge of Harriman may be so imputed for he did not represent the Bank in the withdrawals; like any other payee, he merely presented cheques for payment. He did indeed direct disposition of the proceeds, but that he also did as an individual, exactly as any other payee might direct the deposit to his own account of a cheque drawn upon the bank. Compliance was mere matter of routine in the hands of the Bank's employees. Not being therefore chargeable with Harriman's knowledge, knowledge can be imputed to the Bank only by mere force of law. Courts which are disposed when they can to make legal transactions consensual, often choose this way of accounting for the result, when a person dealing with a corporation fails to hold it in an unauthorized transaction. In the case at bar if J. A. M. A. had merely promised to lend to Harriman without security, the limitations upon its power would have prevented any obligation from arising; it may be convenient to explain this by saying that Harriman would have been charged with notice of them, if he had not actually known them. But when J. A. M. A. went further and actually lent him the money, a debt arose, regardless of the limitations; and when the Bank credited a cheque to Harriman's account, the transaction was the same as though he had cashed it and redeposited the proceeds himself. Though that was forbidden, a loan in fact resulted. Indeed were it not so, charter and statute would become only a means of stripping the corporation which they protect. Perhaps, if the Bank had had actual notice that the cheques were loans, they might not even then be good payment; but more was necessary than knowledge of the charter and the statute. Obviously, the mere fact that Harriman was drawing cheques upon J. A. M. A. did not advise the Bank that they were loans. He had lent a great deal of money to it in the past, and he might be selling it bank shares of which it held a great number; the Bank was not charged with a duty to follow, or pry into, his dealings with this creature of his and his wife's. It follows that the cheques were all valid payments.

This accounts for all the cheques and leaves to be considered only two items; a "debit slip" of $29,000 charged on September 24, 1929, and another on May 26, 1932. The second slip we know more about than the first; the amount was charged against J. A. M. A. on the authority of a slip signed by Burke, who with Austin had issued a cashier's cheque to Harriman & Co. the day before, which was cashed on the twenty-sixth. Burke had no authority to charge J. A. M. A.'s account, but his act was apparently ratified, for the item appeared in the monthly bank statement and passed without objection; Harriman had presumably authorized it and it probably falls in with the rest. However, we will assume arguendo that the authority was not sufficiently proved, and reserve it until we come to Suit No. 7. Although no especial point is made of it, the "debit slip" of September 24, 1929, $29,000, is the same kind of transaction and we will treat it in the same way. One cheque—for $75,000—the trustee challenges for an added reason. One, Marie Dixon, had an account in the Bank on which Harriman had power to draw. He did draw, wrongfully, and deposited the proceeds in J. A. M. A.'s account in the Bank. Immediately he withdrew the amount so credited and used the proceeds for his own purposes. The theory is that by his conversion of Marie Dixon's money and deposit of it in J. A. M. A.'s account, J. A. M. A. became liable to her; and that when Harriman withdrew a corresponding amount from the account, he left the bankrupt exposed to the claim without any corresponding funds to pay it. We cannot see that these circumstances changed the legal relations of the parties.

### Suit No. 5.

This suit is for $100,000 and depends upon the Bank's right to charge against the account a cheque drawn by Harriman to the Bank's order on January 8, 1930, and used by it to pay the balance of a note of the Midtown Trading Corporation, of all of whose shares Harriman was the beneficial owner. This company had bought a thousand shares of the United States Steel Corporation on September 19th, 1929, and the cheque paid the balance of the purchase price, which had been borrowed from the Bank. J. A. M. A. was never reimbursed for about $72,000 of the sum so paid, and charged it to profit and loss on December 31, 1930. It is apparent that the same considerations apply to this cheque as to those in Suit No. 4; indeed the case is weaker because the trus-

tee must ask us to assume that the Midtown Company was equivalent to Harriman personally. The record is without the slightest evidence that any employee of the Bank concerned in the application of the cheques to the Midtown accounts knew that this was true, assuming that it was true. But it would make no difference if any did know; it was Harriman, as J. A. M. A.'s president, who directed the disposition of the cheque and he might have deposited it in his own account.

### Suit No. 6.

This suit is based upon two cheques, each made by Harriman to the order of Hughes, the bookkeeper, the first for $400,000 on February 1, 1930, and the second for $102,600 on January 6, 1931. Hughes deposited these to his account in another bank, and delivered corresponding cheques for the same amount to M. H. O. Corporation, another satellite of Harriman, which at once used the money to pay for shares of stock bought. The trustee's theory as to these is that, being so large, they should have excited the Bank's suspicion that there was wrongdoing afoot; and—we suppose—that it should have refused to cash them when presented. No doubt it would have been apparent to anyone who knew Hughes' position, that the cheques were made payable to him to cover the real nature of the transaction; but that would not have justified dishonoring them. The case is even weaker than the preceding; it is hard to believe that it is seriously pressed.

### Suit No. 7.

The bill in this suit included four counts; there was a fifth, but it has been withdrawn. It is not necessary to consider the merits of any of these, any more than of the two "debit slips," just reserved from Suit No. 4, because the receiver has a sufficient set-off in J. A. M. A.'s liability as shareholder of at least 2,360 shares of its stock. The petition in bankruptcy was filed on February 2, 1934; a receiver had already been appointed for the Bank on October 16, 1933, and on November 13, 1934, the Comptroller levied an assessment of 100%, payable December twentieth. If this was a claim provable in bankruptcy it may be used as a set-off or counterclaim, though the time has expired within which it could be proved. Norfolk & Western R. R. Co. v. Graham, 145 F. 809 (C.C.A.4); Cunningham v. Commissioners of Banks, 249 Mass. 401, 144 N.E. 447.

Brown v. O'Keefe, 300 U.S. 598, 57 S.Ct. 543, 548, 81 L.Ed. 1093, held that an assessment made against the shareholders of a national bank in the course of a voluntary liquidation under section 65 of title 12 U. S.Code (12 U.S.C.A. § 65), was a provable, and therefore a dischargeable, claim. The shareholder's adjudication in bankruptcy in that case was on April 21, 1933, at a time when the bank's liquidation had been already in progress for some time, and the amount of the claim was sure to be ascertainable on September 30, 1933, which was before the time for filing claims had expired. The court thought that under these circumstances the claim was specific enough in obligation and amount at petition filed to be provable, though it especially reserved the question whether an assessment by the Comptroller will serve equally well. The Ninth Circuit has held that it will, though levied after petition filed, Erickson v. Richardson (C.C.A.) 86 F.(2d) 963. So has the Supreme Court of Massachusetts. Cunningham v. Com'r of Banks, supra, 249 Mass. 401, 144 N.E. 447. It is true that formally the claim is conditional in obligation; the Comptroller must assess it under section 55 of title 12 U.S.Code (12 U.S.C.A. § 55). But not every contingency makes a claim unprovable (Maynard v. Elliott, 283 U.S. 273, 51 S.Ct. 390, 75 L.Ed. 1028); it "is at best a question of degree" (Brown v. O'Keefe, supra). The uncertainty here was negligible; the Bank had stopped business almost a year before February 2, 1934; and had been declared insolvent and a receiver had been in possession for over three months. Being insolvent, some assessment was matter of course. True, it was not certain that it would be for the full amount; but a claim certain, or substantially certain, in obligation may be long in liquidation and still provable. That too is "a question of degree"; a lessor's claim, for example, which depends upon the value of the premises for years in the future, is too speculative in amount, aside from its contingency; and here the Bank's assets had to be collected and liquidated, and its liabilities, to be ascertained. That has been, and probably was certain to be, a long affair, but the assessment did not have to await its completion; it was enough if the Comptroller found that there would be a deficiency of two million dollars; and this he did, not much more than three months after the time to file claims had

expired. We cannot see any substantial difference between such a case and Brown v. O'Keefe, supra. We do not suggest that the same result follows if the bank be not insolvent at petition filed; but if it is—certainly if it has been so declared—we think the claim provable.

The trustee wishes an allowance against the Rochester bank, if it succeeds in Suit No. 3, as it has, on the theory that his spade-work alone made possible its recovery. This ingenuous claim is without basis; each party has acted in his own interest; the trustee did his best to invalidate the Rochester bank's judgment lien, seeking to preserve the transfer against it on behalf of all the creditors. Were there nothing more, that alone would put a quietus upon the possibility of any allowance.

The district court entered a separate decree in each suit, without costs. On this appeal the decrees will be affirmed in Suits Nos. One, Two, Four, Five, Six and Seven. The decree in Suit No. Three will be reversed and a decree entered awarding the proceeds to the First National Bank & Trust Company of Rochester, with one bill of costs in that suit against the receiver; no costs as between trustee and receiver. The receiver may tax one bill of costs and disbursements upon this appeal against the trustee; the Rochester bank its costs and disbursements of the appeal against the receiver.