In the Matter of JACK KARDOW
PLUMBING COMPANY,
Bankrupt.

AMERICAN STANDARD, INC.,
Petitioner-Appellant,

v.

Harry A. NASS, Jr., Trustee in Bankruptcy, Respondent-Appellee.

No. 29132.

United States Court of Appeals,
Fifth Circuit.

Oct. 28, 1971.

Rehearing Denied Nov. 22, 1971.

Lewin Plunkett, Dayton G. Wiley, Jerry A. Gibson, Robert A. Allen, Wiley, Plumb & Plunkett, San Antonio, Tex., for petitioner-appellant.

Joe Warren Jones, Thompson & Jones, San Antonio, Tex., for respondent-appellee.

Before COLEMAN, INGRAHAM, and WILKEY,* Circuit Judges.

WILKEY, Circuit Judge:

This case comes to us with an extremely complex and confusing record. As will become clearer later, many of the difficulties in this case are due to the somewhat unorthodox way in which the Referee characterized the bankrupt, and the effect that this had on all of the bankruptcy proceedings.

The Jack Kardow Plumbing Company (the company) was a plumbing business operated by the individual Jack Kardow in San Antonio, Texas. By late 1966 the company was in financial trouble, and on 12 December 1966 an involuntary petition in bankruptcy was filed in the United States District Court for the Western District of Texas against the company by three creditors. The petition alleged that the company was a partnership, consisting of Jack Kardow and one Warfield

---

* Of the District of Columbia Circuit, sitting by designation.

Smith. Service of process was had on Kardow, as representative of the company, but not on Smith, who disputed and denied the existence of a partnership,[1] and no effort was ever made to make either Smith or Kardow *individually* a party to the proceedings. On 17 or 18 January 1967 the Jack Kardow Plumbing Company was adjudged a bankrupt by default.[2] At the time the company was adjudged a bankrupt, no attempt was made to determine whether or not it was a partnership. By this time the Referee had concluded that the subject matter of the petition might apply to two classes of "persons" which could become bankrupts under the Bankruptcy Act, namely, the company as a partnership, or the company as a sole proprietorship owned by Jack Kardow. The Referee concluded that under either possibility he would have jurisdiction, since service of process had been obtained on the company's representative, Jack Kardow.[3] At this point the Referee was apparently treating the company as a "trade style,"[4] an entity unknown to the Bankruptcy Act, which provides only that corporations, partnerships, and individuals may become bankrupt.[5] Considerably later, on 7 October 1969, the Referee clarified his original order of

adjudication (17 or 18 January 1967) to show that the company was really Jack Kardow, the individual, doing business as Jack Kardow Plumbing Company,[6] and it is in that character that the proceedings are now before us.

On 9 June 1967 American Standard, Inc. (Amstan), filed in the estate of the bankrupt proof of secured claim in the amount of $5,634.27.[7] In its petition Amstan maintained that it did not "in any way consent to the Summary Jurisdiction of the Bankruptcy Court to determine the existence or nonexistence of a preference," or to take any action relating thereto.[8] Nevertheless, invoking this summary jurisdiction, on 29 February 1968 the trustee of the bankrupt objected under § 57, sub. g of the Bankruptcy Act[9] to the allowance of the Amstan secured claim, alleging that Amstan received voidable preferential transfers of the bankrupt's property in the amount of $34,659.63, and demanding the recovery of this sum from Amstan. The transfers in question were made on 26 August 1966 and 4 October 1966, and were assignments of the company's accounts receivable to Amstan. By 29 February 1968 Amstan had apparently collected $34,659.63 on the accounts.

1. Appendix, p. 409 (hereafter, page numbers refer to the appendix unless otherwise indicated).

2. It is fairly indicative of the state of the record that at two points it shows that the Referee made this determination on the 18th, while at two others it shows he made it on the 17th.

3. P. 408ff.

4. P. 33.

5. Section 4, sub. b of the Bankruptcy Act (11 U.S.C. § 22) provides who may become involuntary bankrupts:

   Any natural person, except a wage earner or farmer, and any moneyed, business, or commercial corporation, except a building and loan association, a municipal, railroad, insurance, or banking corporation, owing debts to the amount of $1,000.00 or over, may be adjudged an involuntary bankrupt upon default, or an impartial trial, and shall be subject to the provisions, and

   entitled to the benefits of this title. In addition, § 5 of the Bankruptcy Act (11 U.S.C. § 23) provides specifically for a partnership becoming a bankrupt, and "partnerships" are included in the definition of "persons" in § 1 of the Act (11 U.S.C. § 1).

6. P. 413.

7. The claim was secured by a mechanic's lien against property held by Allied Building Company, which had been sold to Allied by the company, after the company had first purchased it from Amstan.

8. Proof of Secured Claim, Paragraph 8, p. 69.

9. 11 U.S.C. § 93(g). "The claims of creditors who have received or acquired preferences, liens, conveyances, transfers, assignments or encumbrances, void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences, liens, conveyances, transfers, assignments, or encumbrances."

After some pre-trial maneuvering [10] the preference issue came to trial before the Referee on 22 and 23 January 1969. At the trial on the preference issue Amstan alleged and sought to prove that at the time of the two assignments the company was a solvent partnership composed of Jack Kardow and Warfield Smith, and attacked the jurisdiction of the bankruptcy court over anything but a partnership on the allegations of the involuntary petition. Furthermore, Amstan maintained that the bankruptcy court had no jurisdiction of the preference issue under § 57, sub. g because Amstan had only filed proof of a *secured* claim in the bankruptcy estate. Amstan maintained that this filing should place it in the same position with respect to its unrelated preference as a creditor who remains entirely passive and against whom the trustee is required to proceed in a plenary suit. Alternatively, Amstan argued that if the trustee was to be allowed to recover the preferences, it was entitled under § 60, sub. c of the Bankruptcy Act [11] to a setoff for credit extended after the alleged preferential transfers.

On 6 March 1969 the Referee issued findings of fact and conclusions of law resolving all these issues against Amstan, and ordered Amstan to surrender to the trustee the $34,659.63 collected on the assignments. Amstan then filed a petition in the District Court for review of the Referee's findings, and in response to this petition on 26 March 1969 the Referee filed a certificate which elaborated somewhat his view that all the evidence gathered in the administration of the estate subsequent to the default adjudication in bankruptcy pointed to the conclusion that the bankrupt was not a partnership, but the sole proprietorship of Jack Kardow [12] Oral argument was heard on 18 September 1969 before the District Judge, and apparently in response to a request by him, on 7 October 1969 the Referee filed a supplement to his certificate of 26 March 1969. In this supplemental certificate the Referee explained at length why he purposely omitted reference to the status of the bankrupt when the default adjudication was originally entered,[13] and he asserted that his deferring the determination of the status of the bankrupt "had no prejudicial effects upon and resulted in no injury to any of the parties at interest of Jack Kardow Plumbing Company." [14] The Referee went on to assert that Amstan, as a creditor, could not be considered a party at interest, and did not have the right to contest the bankruptcy court's adjudication of its jurisdiction over the bankrupt (whatever its status) under § 18, sub. b of the Bankruptcy Act.[15] In

---

10. Another foible demonstrating the sad state of the record relates to these pre-trial proceedings. At one point the record makes the Referee appear to claim that he entered a preliminary order on 29 February 1969, an act which would be *ipso facto* suspect. (Page 13.) Since this act would have taken place after the trial itself, however, it is probable that it happened in 1968, and at another part of the record there is reference to such an order issued on 29 February 1968. (Page 35.)

11. 11 U.S.C. § 96(c). "If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the ad-

judication in bankruptcy may be set off against the amount which would otherwise be recoverable from him."

12. P. 14.

13. Pp. 408–409.

14. P. 410.

15. Section 18, sub. b (11 U.S.C. § 41(b)) presently reads:
The bankrupt and, in the case of a petition against a partnership, any general partner or, in a case of a petition in behalf of a partnership, any general partner not joining therein, may appear and plead to the petition within five days after the return day or within such further time as the court may allow.

this supplemental certificate the Referee also enumerated the factors that had led him to conclude that the company was not a partnership.[16]

In this 7 October 1969 certificate the Referee also revealed another puzzling aspect of this case, namely, that at sometime after the involuntary petition was filed against the company, Jack Kardow, acting as an individual, filed a voluntary bankruptcy petition.[17] The Referee commented in the supplemental certificate that Kardow's subsequent proceeding had no relationship to the prior involuntary proceeding presently under review. Furthermore, he went on to add, "As the involuntary petition was sufficient to adjudicate Jack Kardow individually a bankrupt doing business as Jack Kardow Plumbing Company, the subsequent voluntary proceeding filed by Jack Kardow was unnecessary and cumulative of the involuntary petition previously filed." [18]

On 17 November 1969 the District Court affirmed the order of the bankruptcy court, expressly adopting the findings of fact and conclusions of law entered by the Referee on 6 March 1969.

In appealing this decision of the District Court, Amstan raises the three issues that it argued before the Referee. For our purposes the issues that are before us may be phrased as follows: (1) May Amstan challenge the jurisdiction of the Referee to adjudicate the company a bankrupt on an involuntary petition filed against a partnership? (2) Did the Referee have summary jurisdiction over Amstan to try the issue of voidable preference and to order Amstan to return such preferences? (3) Would Amstan be entitled to a setoff for materials subsequently furnished the bankrupt, if it must surrender its preferences?

## I. *The Attack on the Jurisdiction of the Referee*

Amstan attacks the jurisdiction of the Referee over the company, asserting that the involuntary petition, filed against a partnership, cannot confer jurisdiction on the Referee to deal with an entity which he has found to be an individual. The record shows that the company was adjudicated a bankrupt on meagre evidence which consisted primarily of the allegations in the involuntary petition filed by creditors who, it now seems clear, were not in possession of accurate information regarding the status of the debtor. This has resulted in a confused administration of the bankrupt estate whereby, at least initially, and perhaps even now, only the assets of the company, and not the personal assets of Kardow are involved in this proceeding.

In the beginning of this action, when the Referee thought he was dealing only with a "trade style," Kardow's individual assets were not brought into the bankruptcy court. At the conclusion of the trial of the preference issue, however,

Formerly, this section permitted a creditor as well to oppose the petition. In respect of this change, it was said:

> The old act provided in Sec. 18, sub. b, that the bankrupt or any creditor might appear and plead to the petition within five days after the return date or within such further time as the court might allow. In Sec. 18, sub. b of the Chandler Act, this provision was changed by omitting the words "or any creditor." Similarly, Sec. 59, sub. f of the old act, 11 U.S.C.A. § 95, sub. f, gave creditors, other than the original petitioners, the right to enter their appearance at any time and join in the petition or file an answer and be heard in opposition to the prayer of the petition. In Sec. 59, sub. f of the Chandler Act, the words "or file an answer and be heard in opposition" were left out. These omissions make it clear that Congress did not intend to give a statutory right to creditors to contest the allegations in an involuntary petition. In re Carden, 118 F.2d 677, 679 (2d Cir. 1941), cert. denied, 314 U.S. 647, 62 S.Ct. 91, 86 L.Ed. 519 (1941).

16. Pp. 411–412.

17. We are unable to find the exact details of this filing in the record. Reference to such an action is definitely made, however. See, e. g., pp. 301, 413.

18. P. 413.

the Referee apparently decided that the bankrupt was not the partnership alleged in the involuntary petition, but was actually the sole proprietorship of Jack Kardow. Since the Bankruptcy Act does not provide for bankruptcy proceedings against sole proprietorships limited to involving *business assets only,* but provides only for actions against individuals *qua* individuals, the Referee's decision that it was the individual Kardow who was before the bankruptcy court in this proceeding should have resulted in a decision that Kardow's individual action would be consolidated with the proceeding against the company. It is possible that this was done, and there is a possible inference to that effect from some of the statements by the Referee,[19] but the record is not clear on this point. Indeed, there is no solid pronouncement by the Referee after the trial on the preference issue that serves to contradict the evidence in the record which strongly indicates that the proceeding now before us dealt with "no other assets than [those] owned by Jack Kardow doing business as Jack Kardow Plumbing Company." [20]

More will be said on the problem of marshalling Kardow's individual assets later in this opinion, for now it is sufficient to remark that substantial questions regarding the propriety of the casual procedures involving (or not involving) the status of the bankrupt might have been raised had Jack Kardow himself petitioned to have the original adjudication against the company set aside. This he did not do, however, and we are of the opinion that such questions need not be considered when the attack on the adjudication is either directly or indirectly made by a creditor such as Amstan.

■■ It has long been settled that Congress in adopting the Bankruptcy Act of 1938 rewrote § 18, sub. b of the 1898 version of the Act to eliminate the right of a creditor to be heard in opposition to an adjudication in bankruptcy.[21] Amstan seeks to circumvent the effect of this law by raising the question of jurisdiction of the bankruptcy court. Congress in amending § 18, sub. b, argues Amstan, may have intended to take away the creditors' right to challenge the substance and procedure of the adjudication, but it did not intend to strip creditors of their right to challenge jurisdiction. We must reject this interpretation of the congressional intent.

Amstan's posture here does not materially differ from that of the creditor in In re Tanner,[22] in which a creditor challenged the jurisdiction of the bankruptcy court over a controversy initiated by an involuntary petition alleging a partnership when subsequent developments showed otherwise. As in the case at bar, the creditor argued that although § 18, sub. b as amended in 1938 prevents a creditor from contesting "the allegations of a bankrupt's petition, voluntary or involuntary, he or any other interested party may always challenge the jurisdiction of the Court." [23] But the court, noting that Congress intended by the 1938 amendment to deprive the creditor of the opportunity "to protect a preference or to retain some other undue advantage at the expense of the other creditor," [24] denied relief.

The legislative history of the Act of 1938 casts further doubt on the view Amstan urges upon us. In a part of a House Report dealing with the question of creditors' participation in the initial pleadings it was said that:

> The right of creditors to file an answer and oppose the petition has been eliminated in the amendment of section 18b, and section 59f has been changed to correspond with this amendment. *A creditor should not be permitted to oppose an adjudication;*

---

19. *Ibid.*

20. *See, e. g.,* Referee's Certificate of 26 March 1969, p. 12.

21. *See* note 15, *supra.*

22. 242 F.Supp. 172 (M.D.Pa.1965).

23. *Id.,* at 173–174.

24. *Id.,* at 174.

*invariably, the motive of such a creditor is to protect a preference* or to retain some other undue advantage at the expense of the other creditors, contrary to the fundamental purpose of the Act—an equitable distribution among all creditors.[25]

Amstan is not here seeking to file an initial pleading, but in effect it seeks to challenge the jurisdiction of the bankruptcy court in the same way it would if it were allowed to make such an initial pleading, and the intent of Congress to forbid such challenges by initial pleadings should also be taken to forbid the challenge that Amstan makes here.[26] This becomes even more evident upon a close consideration of the effects of a successful challenge to the jurisdiction of the Referee in the case at bar.

If Amstan were to prevail in its assertion that the bankruptcy court was without jurisdiction to adjudicate the company bankrupt, the adjudication on the involuntary petition filed on 23 December 1966 might have to be voided and bankruptcy proceedings on a new petition would be required, according to the maxim *ex nihilo nihil fit*. Since under § 60, sub. a of the Act[27] a transaction is vulnerable as a preference only if it occurs within four months of the filing of the petition in bankruptcy, the assignments to Amstan in August and October of 1966 could obviously not be treated as preferential transfers unless the new petition were assigned the filing date of the allegedly defective petition.

■ While in many instances substantial changes made in amended petitions in bankruptcy are considered to "relate back" to the original petition,[28] this is impossible where, as Amstan contends, the original petition is so inadequate as to deprive the bankruptcy court of jurisdiction. As Amstan undoubtedly realizes, the power to decide a controversy cannot be projected back to a date on which neither the subject matter nor the parties were within the jurisdiction of the court.

■ Amstan's attack upon the jurisdiction of the bankruptcy court is therefore patently motivated by its desire to protect its preferences; this is the kind of attack Congress said that it intended to interdict when it amended § 18, sub. b in 1938, and we give effect in this decision to the expressed will of Congress. As a creditor seeking to protect its preferences, Amstan may neither directly nor collaterally attack the jurisdiction of the bankruptcy court.

■ It is possible, however, to interpret Amstan's attack here as something less than a broadside aimed at the jurisdiction of the bankruptcy court. While this contention is not made explicit in Amstan's briefs, Amstan's attack on the Referee's jurisdiction might simply be limited to the competence of the Referee to void a preference without first reaching a determination of what entity has given the preference. In other words, to us a metaphor found helpful here, the trustee or the Referee must first have a fulcrum with which to pry out a preference, and that fulcrum is a determination of the entity which allegedly gave the preference. Such a determination surely is necessary before it can be

25. H.R.Rep.No.1409 on H.R. No. 8046, 75th Cong., 1st Sess. 17 (1937). (Emphasis supplied.)

26. For another case which held that a creditor has no right to challenge the pleadings in opposition to the petition in bankruptcy, see Commercial Credit Corporation v. Skutt, 341 F.2d 177 (8th Cir. 1965).

27. 11 U.S.C. § 96(a) (1). "A preference is a transfer, as defined in this title, of any of the property of a debtor to or for the benefit of a creditor for or on account of an antecedent debt, made or suffered by such debtor while insolvent and *within four months of the filing* by or against him of the petition initiating a proceeding under this title, the effect of which transfer will be to enable such creditor to obtain a greater percentage of his debt than some other creditor of the same class." (Emphasis supplied.)

28. 2 Collier on Bankruptcy, ¶¶ 18.23, 18.26 (14th ed. 1964).

seen whether the entity which gave the alleged preference was insolvent, and to know with which entity one is involved certainly helps in determining whether the alleged preference was given for antecedent debt, whether the persons receiving the preference should have been aware of the insolvency, and so forth. We would have to reject any such argument here, however, since by the time the preferences *were* actually pried out, that is after the trial on the preference issue, a determination was made that the company was *not* a partnership, but was simply owned by the individual Jack Kardow, so that the fulcrum to pry out the preference was present.[29]

■ Lest we be thought to discuss this lesser attack, and summarily reject it, simply to raise the proverbial straw man only to knock him down, we hasten to add that it points up some difficulties that have troubled us about this case. Though the Referee finally arrived at a determination of the entity involved in the proceeding, he did not do so for more than two years after the involuntary petition was filed, and the company was adjudged bankrupt. Had the Referee, and the trustee, too, determined immediately that the entity involved was Jack Kardow himself, perhaps Kardow's individual assets would have quickly been marshalled, and there might have been more for all the creditors than there now will be. If this were the case, we would have some misgivings about appearing to punish a creditor such as Amstan, who has diligently made arrangements to gain payment of debts owed to it, when the bankrupt's trustee, and the Referee, by their failure to determine the entity with which they were dealing, may have failed to recover some of the assets which should have been available to all creditors. Nevertheless, our duty is to see that "an equitable distribution *among all creditors*" is made,[30] and we cannot allow the lack of diligence on the part of the Referee and the trustee to result in a windfall for Amstan.

■ Nevertheless, at this time we do require that, if it has not already been done, the individual bankruptcy action of Jack Kardow be combined with the case at bar, so that whatever individual assets of Kardow that are left in the jurisdiction of the bankruptcy court will be available to the creditors of the company. This assumes, of course, that no final determination has yet been made in the individual action. If the voluntary petition of Kardow individually is no longer before the court, and his individual assets *are* gone, then Amstan has been injured by the dereliction of the trustee and the Referee. So, however, have the other creditors been injured by this dereliction, and we will not favor one over the others. Amstan must give up its preferences.

## II. *The Summary Jurisdiction of the Bankruptcy Court over the Preference Issue*

The trustee contends that the Supreme Court's decision in Katchen v. Landy,[31] with its holding that the bankruptcy court may exercise summary jurisdiction to adjudicate preference issues raised when the trustee in bankruptcy objects under § 57, sub. g of the Bankruptcy Act to allowance of a creditors' *claim*, is dispositive of the issue here. Indeed, if this holding is interpreted to mean that summary jurisdiction attaches to a § 57, sub. g objection to *any* claim, including a *secured* claim, we need look no farther than *Katchen*.

29. *See, e. g.,* p. 380. Amstan disputes this finding, as it does many of the factual determinations made by the Referee and expressly adopted by the District Court. We have carefully reviewed the record in this regard and find that the Referee's factual determinations are well supported by record evidence; certainly they are not, in our view, "clearly erroneous." DeMet v. Harralson, 399 F.2d 35, 38 (5th Cir. 1968). Accordingly, we do not take up Amstan's factual contentions in this opinion.

30. H.R.Rep.No.1409, *supra*, note 25. (Emphasis supplied.)

31. 382 U.S. 323, 86 S.Ct. 467, 15 L.Ed.2d 391 (1966).

However, careful reading of the *Katchen* opinion convinces us that the Court never intended its holding to be so broadly read.

The opinion itself does not focus on the type claim to which the § 57, sub. g objection is raised. It is directed in its entirety to rationalizing why it is in accordance with the structure and purpose of the Bankruptcy Act and the applicable sections thereof to bring within the summary jurisdiction of the bankruptcy court preference issues raised by a § 57, sub. g objection and to permit the bankrupcty court to order surrender of the preferences.[32] It was in this context that the Court, swayed by manifestations of congressional intent that under the provisions of the Act bankrupt estates should be settled and administered promptly, cheaply, and effectually, found that objections to claims, including § 57, sub. g objections, shall be determined in summary proceedings.[33] The Court devoted none of the opinion to consideration of the claim involved.

■ Explanation for this neglect of the nature of the claim is provided in the Court's own words. Footnoting its discussion of the bankrupcty court's jurisdiction over objections lodged under § 57, sub. g by the trustee, the Court pointed out that "[t]he exact reach of § 57 sub. g is not entirely settled, see 3 Collier on Bankruptcy, ¶ 57.19 [3.2] (14th ed 1964), and that question is not involved here."[34] In other words, the Court specifically said it was deciding *Katchen* on the premise that the § 57, sub. g objection is properly raised against the claim. It gave notice that it was not deciding that *all* claims are properly subject to objection under § 57, sub. g.

What type claim may not be subject to § 57, sub. g objection was of no import to the decision in *Katchen* because the claim under consideration was an *unsecured* claim to which the trustee's objection has long been held proper.[35] But as the Supreme Court realized, we think, the propriety of such objection is

---

**32.** The focus upon preferences rather than the type of claim is unmistakable as Mr. Justice White frames the issue at the beginning of the opinion: "The disputed issue here is whether a bankruptcy court has summary jurisdiction to order the surrender of voidable preferences asserted and proved by the trustee in response to a claim filed by a creditor who received the preferences." *Id.*, at 325, 86 S.Ct. at 470.

**33.** Considering the general framework of the Act, the Court found that its provisions were designed to make the bankruptcy laws inexpensive in their administration and to lead to a "prompt and effectual administration and settlement of the estate of all bankrupts within a limited period." 382 U.S. 323, 328, 86 S.Ct. 467, 472. Summary disposition, the Court found, "is one of the means chosen by Congress to effectuate [the latter] purpose." 382 U.S. 323, 329, 86 S.Ct. 467, 472.

Zeroing in on the power of the bankruptcy court to decide objections lodged by the trustee in bankruptcy, the Court said "the Act itself directs that '[o]bjections to claims shall be heard and determined as soon as the convenience of the court and

the best interests of the estate and the claimants will permit," 382 U.S. 330, 86 S.Ct. 467, 473, and found that Congress intended this provision to mean that objections shall be determined in summary proceedings. Thus, concluded the Court, objection raised by the trustee under § 57, sub. g is subject to summary adjudication by the bankruptcy court.

**34.** As is discussed in greater detail in this opinion at the text accompanying notes 37–41, *infra*, § 57, sub. g is directed towards restoring preferences to the estate in order to equalize the dividends of the creditors sharing in the general assets. Since creditors who are unsecured file their claims with the specific intent of recovering some portion thereof in the general distribution, they properly are subject to objection under § 57, sub. g. Conversely, a *secured* claimant does not look to the general assets; a compelled restoration of a preference would swell the general assets, in which he makes no claim to participate. For a general discussion of this subject, see 3 Collier on Bankruptcy, ¶ 57.19 [2] (14th ed. 1964).

**35.** 3 Collier on Bankruptcy, ¶ 57.19 [3.2] (14th ed. 1964).

not so well established with respect to *secured* claims—their relationship to § 57, sub. g is treated in the very paragraph of Collier on Bankruptcy that the Court cited as indicative of § 57, sub. g's unsettled reach.[36] An essential prerequisite to the applicability of *Katchen* is, therefore, a determination whether the secured claim giving rise to the objection properly is subject to § 57, sub. g. To this task we now turn.

■ Section 57, sub. g reads, in pertinent part:

The claims of creditors who have received or acquired preferences, * * void or voidable under this title, shall not be allowed unless such creditors shall surrender such preferences. * *

As the Supreme Court noted in *Katchen* these words indicate that § 57, sub. g "is concerned with *creditors* rather than *claims*." [37] But it is not concerned with *punishing* creditors who have obtained preferences; rather, it is directed towards *equalizing* the dividends of all creditors seeking to share in the bankruptcy estate by forcing the preferred creditor to disgorge all preferences and return them to the estate before taking aught.[38]

"In none of its various shapes since the Act of 1898 has [§ 57g] been intended to declare a forfeiture or impose a penalty. Its strictly practical approach, free from moralizing discriminations, is evidenced by the fact that it does not exclude from its application fraudulent transferee[s], * * * Subdivision g is designed to give creditors an option to keep (subject, of course to further action by the trustee) what they have received *in fraudum legis* and take no dividends from the estate, or to surrender their spoils and share equally with other creditors in the general distribution." [39]

■ It follows that if a creditor claims no share of the estate he may not properly be reached by objection

---

36. 3 Collier on Bankruptcy, ¶ 57.19 [3.2] (14th ed. 1964), provides in part:
If a creditor holds an otherwise valid lien, not impeachable as a preference or otherwise voidable, and claims as a secured creditor nothing except the proceeds thereon, it has been held that he is not under a duty to surrender a voidable preference or voidable transfer which he may have received on another unrelated claim. The reason therefor lies in the purpose and function of § 57 sub. g, which is not primarily to undo preferences, transfers or liens voidable under the Act, but to achieve equality of distribution to the general creditors claiming their share out of the estate. Hence, if a creditor chooses not to claim such a share, there is no immediate need to broach the question of the voidability of another transfer.
    *    *    *    *    *

37. 382 U.S. 323, 330, n. 5, 86 S.Ct. at 473 (1966). (Emphasis supplied by the Court.)

38. The Supreme Court appears to recognize in *Katchen* that this is the rationale in back of § 57, sub. g. Treating the power of the bankruptcy court to order surrender of the preferences in proceedings under § 57, sub. g, the Court said:

What we said in Alexander v. Hillman, 296 U.S. 222 [56 S.Ct. 204, 80 L.Ed. 192], in connection with the jurisdiction of a receivership court to entertain a counterclaim against a claimant in the receivership proceeding, is equally applicable here:
"By presenting their claims respondents subjected themselves to all the consequences that attach to an appearance. * * *
    *    *    *    *    *
"Respondents' contention means that, while invoking the court's jurisdiction to establish their right to participate in the distribution, they may deny its power to require them to account for what they misappropriated. *In behalf of creditors and stockholders, the receivers reasonably may insist that, before taking aught, respondents may by the receivership court be required to make restitution.* That requirement is in harmony with the rule generally followed by courts of equity that, having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief." (Citation omitted.) (Emphasis supplied.)
382 U.S., at 335, 86 S.Ct. at 476.

39. 3 Collier on Bankruptcy, ¶ 57.19 [2], at 280-281 (14th ed. 1964).

under § 57, sub. g even though he holds preferences voidable under § 60, sub. b.[40] The trustee must proceed in a plenary suit to recover them. Were it otherwise § 57, sub. g would be diverted from its intended goal, of achieving equality of distribution among general creditors claiming from the general assets, towards functioning as a tool to undo preferences of creditors who have opted "to take no dividends from the estate." This would constitute punishment of the preferred creditor, a concept foreign to § 57, sub. g, since under *Katchen* to permit objection under § 57, sub. g is to subject the preferences to the summary jurisdiction of the bankruptcy court, the exact consequence creditors attempt to avoid by eschewing the general distribution. Moreover, because the creditor claims nothing from the general assets, "there is no immediate need to broach the question of the voidability of another transfer. Such a matter may be referred to separate proceedings." [41]

Bearing this in mind, we turn to what it is that the creditor seeks when he files proof of a secured claim in bankruptcy.

■ There is no provision of the Bankruptcy Act forcing a secured creditor to prove his claim in order to obtain satisfaction from his security. He may, as we pointed out previously, abstain from entering the bankrupcty proceeding and rely upon his security to cover the debt. Indeed, if the security is sufficient to cover the debt, a secured creditor's claim will not be allowed, making the act of filing a useless, though permissible, gesture.[42] Even if the security has passed into the hands of the trustee, a secured creditor need not prove his claim to retain his secured status.[43] The result, as pointed out in Collier on Bankruptcy, is that

> [t]he proof in bankrupcty of a claim as secured implies that the creditor wishes primarily to avail himself of his security and to share in the general assets as to the unsecured balance. *Only on account of, and with respect to this share in the general assets, is it necessary to file a proof of claim.* * * * It should not contain anything that might lead the court to the conclusion that the creditor wishes to confine himself to his security. * * * *The proof of a claim asserts a right to share in the general assets. It refers to the unsecured balance over and* above the value of the security.
>
> * * * * * *
>
> The proof of a secured claim implies that the creditor expects his security to satisfy only a part of the debt and *serves to announce that he wishes to participate in the estate, together with the general creditors,* for the balance.[44]

■ Clearly, in the great majority of cases proof in bankruptcy of a secured claim signifies the desire of the creditor to participate with the general creditors in the distribution of the general assets, and hence the claim properly is subject to objection under § 57, sub. g. The policy of equalization between creditors claiming out of the general assets, which is at the heart of the section, would require such secured creditor to return to the estate his preferences before sharing in the distribution.

---

40. Section 60, sub. b (11 U.S.C. § 96(b)) provides that the trustee may avoid a preference "if the creditor receiving it or to be benefited thereby or his agent acting with reference thereto has, at the time when the transfer is made, reasonable cause to believe that the debtor is insolvent. * * * "

41. 3 Collier on Bankruptcy, ¶ 57.19 [3.2], at 286 (14th ed. 1964).

42. 3 Collier on Bankruptcy, ¶ 57.07 [3.3] (14th ed. 1964).

43. *Id.* However, the secured creditor's right to the security that has passed into the hands of the trustee may only be asserted in the bankruptcy court. Although the creditor may choose to assert this right in the form of a proof of secured claim, the better practice is to file an intervening petition.

44. 3 Collier on Bankruptcy, ¶ 57.07 [3.2–3.3], at 165–169 (14th ed. 1964) (emphasis supplied).

In such circumstance the bankruptcy court is empowered under the rationale of Katchen v. Landy to hear the preference issues in summary proceedings and to order return of the preferences pending summary disposition of the issues.

The fact that most proofs of secured claim constitute assertions of a desire to participate in the general distribution must not, however, be used as an excuse cavalierly to declare the claim of each and every creditor who so files subject to § 57, sub. g objection and consequent summary proceedings. No provision of the Bankruptcy Act prevents a creditor with adequate security and no thought of participating in the general distribution from filing a proof of claim. Some creditors may do so through inadvertence or unfamiliarity with the intricacies of the law bearing on their right to status as secured creditors. And if the security has fallen into the hands of the trustee, a creditor may, as a way of showing his adverse claim, file a proof of secured claim.[45]

█ As we have stressed in previous decisions, "[T]he admittedly desirable end of expeditious administration of bankrupt estates should not be allowed effectively to eliminate the protection afforded litigants by the traditional safeguards of a plenary suit, with its right to trial by jury and cross-examination of witnesses."[46] The court should, in the face of a § 57, sub. g objection to a secured claim, give due weight to the historical significance of proof of such claim in bankruptcy, but it should not altogether lose sight of the possibility that the creditor did not in filing intend to make any claim to the general assets. Particularly in view of the consequences to the creditor in permitting a § 57, sub. g objection—loss of the opportunity to litigate the preference issues in a plenary suit—the proof of secured claim and the circumstances of its filing should be examined for indications of other than the historically-attributed intent.

█ Some of the more obvious questions that may require resolution in this type inquiry are whether the proof of secured claim contains glaring errors indicative of an inadvertent filing, whether the wording of the proof of secured claim indicates that the creditor intends solely to look to his security for repayment, whether the proof represents merely an adverse claim to security in the hands of the trustee, and whether the creditor is sophisticated in his knowledge of the way in which bankruptcy estates are administered. Of course we do not imply that this list is exclusive, or that any one question may be determinative. In the final analysis, the question is what is the most reasonable inference to be drawn from all the circumstances of the filing of the proof of secured claim? If the most reasonable inference is the historic inference that in so filing the creditor intended to share in the distribution of the general assets, § 57, sub. g objections to the claim may be resolved in summary proceedings. We now turn to an analysis of the evidence in the record of the circumstances surrounding the filing of Amstan's proof of secured claim.

█ The proof of secured claim in the case at bar is completely regular in form; no allegation has been made that it was unintentionally filed. It declares, in pertinent part:

2. That Jack Kardow Plumbing Company, the above-named bankrupt, was at and before the filing against him of the Petition for Adjudication of Bankruptcy, and still is, justly and truly indebted and liable to this Corporation in the sum of $5,634.27.

\* \* \* \* \* \*

6. That the Corporation does not hold, and has not, nor has any person by its order, or to the knowledge or belief of the undersigned, for its use, had or received any security, or securities for the debt except: Mechanic's lien for sales of a value of $5,634.27,

45. *See* n. 43, *supra.*

46. Gill v. Phillips, 337 F.2d 258, 262–263 (5th Cir. 1964).

with Mechanic's Lien Affidavit filed in Volume 682, Page 329 of the Builder's and Mechanic's Lien Records of Bexar County, Texas, said Mechanic's Lien existing against funds held by the owner's Allied Building Company, Inc., and against the owner's property which is more fully described as follows: * * *

The $5,634.27 debt is thus described as secured by a mechanic's lien for sales of that value. This, however, is insufficient to destroy the inference that in filing the claim Amstan was asserting a right to share in the general distribution. There is no indication that Allied Building Company agrees that the value of the property against which the lien is asserted is $5,634.27. Indeed, testimony at the trial on the preference issues, as we note in detail later, indicates that Allied has actively disputed this assigned value and that Allied's resistance may have been what motivated Amstan to file the claim.[47]

Nor can Amstan argue that the claim was filed because it mistakenly believed such action necessary to perfection of its status as a secured creditor. We think that we may infer that the legal staff of a corporation like Amstan, which is in the business of supplying plumbing materials to many small, independent plumbing and contracting firms, has had sufficient exposure to bankruptcy proceedings not to be confused as to the proper way in which to protect Amstan's secured status.

It is true, however, that in Paragraph 8 of its Proof of Secured Claim Amstan has said:

> That the Corporation does not in any way consent to the Summary Jurisdiction of the Bankruptcy Court to determine the existence or non-existence of a preference or fraudulent transfer or to take any action relating thereto.[48]

Amstan has not, however, said anything to disclaim the inference that in proving

its secured claim Amstan intended to share in the general distribution. Paragraph 8 would not, of course, remove the jurisdiction over the preference issue that might be given under the bankruptcy law by Amstan's action in filing this proof of secured claim, absent a declaration of intent not to share in the general assets. To our ear, Amstan's action in filing the proof of claim here speaks louder than the words of the denial of Paragraph 8.

Taking account of the declarations in the proof of claim and the circumstances under which it was filed, we find no refutation of the historical inference that in proving its secured claim Amstan meant to share in the general distribution, should it be unsuccessful in obtaining full satisfaction of the debt from Allied.

While, as we have stressed, it may not be true in all instances that filing proof of a secured claim will subject the secured creditor to the summary jurisdiction of the bankruptcy court over preference issues, we think that in this case it will, and perhaps it should in any case where the creditor intends through such a filing to use advantageously the bankruptcy court. In the case at bar we find that submitting the preference issue to the summary jurisdiction of the bankruptcy court "is in harmony with the rule generally followed by courts of equity that, having jurisdiction of the parties to controversies brought before them, they will decide all matters in dispute and decree complete relief."[49] The objection under § 57, sub. g was therefore properly taken against Amstan's secured claim, and summary jurisdiction over the preference issues was properly exercised by the bankruptcy court.

III. *Amstan's Claim to a Section 60, sub. c Setoff*

After Amstan received its first voidable preference on 26 August 1966, it invoiced to Jack Kardow plumbing sup-

---

47. See n. 57, *infra.*

48. Pp. 69–70.

49. Alexander v. Hillman, 296 U.S. 222, 241–242, 56 S.Ct. 204 (1935), quoted in Katchen v. Landy, *supra*, 382 U.S., at 335, 86 S.Ct. at 476.

plies in the amount of $12,551.77. But by agreement made between the parties on 26 August, Kardow in ordering the supplies was required to specify the job site and street address at which each item would be consumed. Amstan thereupon delivered the supplies not to Kardow but to the job sites and street addresses specified. This practice differed completely from the previous setup between Amstan and Kardow whereby the goods were delivered to Kardow personally and became part of his inventory. All of these supplies were consumed in the construction of dwellings in the Harmony Hills and Huntleigh Park residential sub-developments.

Subsequent to the second voidable preferential transfer on 4 October 1966, Amstan invoiced to Kardow under the same arrangement plumbing supplies in the amount of $12,909.77. These were consumed in a Bexar County construction project owned by Allied Building Company, Inc.

The revised arrangement under which these goods were transferred was undoubtedly engineered by Amstan to provide for its records identification information that would be necessary should it become desirable to file mechanic's liens against the properties in which the goods were consumed.[50] In fact, Amstan did file such a lien against a portion of the property in Bexar County owned by Allied; this was the $5,634.27 lien that it later proved in bankruptcy, an act whose consequences we discussed in detail in the preceding section of this opinion.

▬ A creditor is entitled to a § 60, sub. c setoff against the amount of preference that would otherwise be recoverable from him if he "has been preferred, and afterward in good faith gives the debtor further credit *without security of any kind for property which becomes a part of the debtor's estate,* the amount of such credit remaining unpaid at the time of the adjudication in bankruptcy. * * *"[51]

Amstan claims that it should be allowed to set off against the amount of preference recoverable the $12,551.77 worth of goods invoiced to Kardow after 26 August plus the $12,909.77 worth of goods invoiced to Kardow after 4 October—less, of course, any recovery had from Allied on its $5,634.27 lien. The trustee argues that no setoff is due Amstan because the goods were not sold "without security of any kind."

Basic to the trustee's argument is Amstan's manifest intention in carrying out these post-preference transactions with Kardow to protect itself by reserving the option to file mechanic's liens against the properties in which the supplies were consumed. In so doing, the trustee argues, Amstan had "security" of some kind for the materials invoiced to Kardow and thus may not claim a § 60, sub. c setoff therefor. We do not agree.

▬ Reservation of the option to become secured is not equivalent to *being* secured. Neither, concededly, is it the same as having no security at all, at least while the option exists. But once the option to become secured is declined, as it assuredly is when a § 60, sub. c. setoff is claimed,[52] the creditor is most

---

50. Under Vernon's Ann.Rev.Civ.Stat. of Texas, Art. 5452 (1961), Amstan had the right to file a materialman's lien against properties in which the supplies were consumed. However, to be in position to satisfy the requirements of Art. 5452, subd. 2, par. b (1), which defines "material," it was necessary for Amstan to be able to identify the materials consumed and the location of their consumption.

51. For citation to the U. S. Code and full text of § 60, sub. c, *see* n. 11, *supra.*

52. When a creditor takes steps to retain an option to become secured, he is in essence retaining a choice between two mutually exclusive means of obtaining payment: the first is to perfect his security and foreclose it from being counted as part of the debtor's estate; the second is to forego the security, either by an overt act or by failure to act within statutory limits, and look to the debtor's estate for payment. On claiming a § 60, sub. c setoff a creditor is making a declaration inconsistent with any hypothesis that he

logically characterized as "without security of any kind." To do otherwise would lead to a result in conflict with the purpose of § 60.

A preference is a payment by the debtor of an antecedent debt within four months of the bankruptcy. Underlying the provisions of § 60 is the aim of forcing the creditor, who at the time of the preference knew the debtor was insolvent, to return to the estate the amount by which his preference has diminished it.[53] If after the preference the creditor replaces part of that diminution by selling goods to the estate on credit, he is liable to return (subject to the good faith requirements of § 60, sub. c) only the outstanding balance and not the entire amount of the preference— for this balance is the sum that will render the estate whole.[54] However if the creditor obtains security of any kind for the goods subsequently sold, he is not considered to have replaced any diminution caused by the preference. Thus, to make whole the estate the full amount of the preference must be repaid.

In the case at bar, Amstan declined its option to become secured on most of the property invoiced to Kardow after the preferences. The amount by which the preferences depleted Kardow's estate was thus replaced in part by the value of the property added. If Amstan is now required to repay the entire amount of the preferences, the estate will not merely have been made whole but will have been *augmented* to Am-

stan's detriment, contrary to the principle of restoration underlying § 60.[55] Since Amstan satisfies all of the other requirements of § 60, sub. c and since the bankrupt estate has been enhanced to the extent of the property added by the creditor, we find that Amstan meets the test of being without security of any kind and is therefore entitled to a setoff under § 60, sub. c.

We have some question, however, as to the amount of setoff to be allowed Amstan. This question is raised primarily in connection with the manner in which Amstan merchandised its supplies to Kardow after the preferences. With the intention of preserving its option to obtain security by filing mechanic's liens, Amstan arranged the sales to Kardow to keep the supplies from passing into his hands. In carrying out this scheme, Amstan purposely delivered the materials directly to the job sites. All Kardow ever received from Amstan were invoices. What was being added to Kardow's estate was not, therefore, inventory or credit for the goods but a tentative contract right for their price against the builders to whom Amstan delivered, since Kardow was the nominal seller.[56]

The record, though unclear as to the exact value of these contract rights, contains testimony by the trustee indicating that the amount ultimately recovered on all accounts receivable will be much less than the amount of setoff claimed by Amstan as the value of the property added to the estate, *i. e.*, the total of the

---

wishes to foreclose his security from coming into the estate since the express terms of that section require that the property in question "has become a part of the debtor's estate" and that the credit therefor is "without security of any kind." The most reasonable interpretation of the creditor's intent in filing such claim is that he expressly denies any adverse claim to the property supplied or to any other property that would diminish the estate in its stead. In other words, the option to become secured is at that point irrevocably declined.

53. *See generally* 3 Collier on Bankruptcy, ¶¶ 60.01, 60.57, 60.59 (14th ed. 1964).

54. *See* 3 Collier on Bankruptcy ¶ 60.67 (14th ed. 1964).

55. Walker v. Wilkinson, 296 F. 850 (5th Cir. 1924).

56. We say that the contract right was only "tentatively" added to Kardow's estate because Amstan could have perfected its mechanic's liens on the property supplied (as it did on $5,634.27 worth), divesting Kardow of all claim to payment. Kardow cannot be said to have possessed absolutely such contract rights until Amstan irrevocably decided not to seek its security.

invoiced prices.[57] While any disparity between the invoiced prices of goods and the trustee's recovery on accounts receivable involving those goods is of no consequence under § 60, sub. c where the materials themselves become at some time part of the estate,[58] a different result would seem to be called for where, as here, the seller by design prevents the materials from ever coming into the debtor's possession and subjects those materials to his inchoate lien which, if perfected, divests the debtor of even the contract right tentatively added to his estate. These conditions cannot be swept aside simply because after the debtor's bankruptcy the seller decides to forego his lien, make the estate's contract right absolute, and claim a setoff under § 60, sub. c.

Under these circumstances, it seems to us that the creditor ought not to be permitted a setoff exceeding the value of the contract right it finally vested in the estate by deciding to claim a setoff under § 60, sub. c instead of perfecting its liens. This contract right is the only property which, in our view, ever became "a part of the debtor's estate" within the meaning of § 60, sub. c. Amstan may get no more than it gave. Accordingly, we find that Amstan is entitled to a § 60, sub. c setoff not in excess of that portion of collections on accounts receivable attributable to the invoiced supplies.

For this determination, and for other proceedings consistent with this opinion, this cause is

Remanded to the District Court.

57. The record contains the following colloquy between Mr. Jones, attorney for the appellee trustee, and Mr. Harry A. Nass, Jr., trustee of the estate:

Q. All right. I will ask you whether or not the trustee has been successful in reducing these assets to cash?

A. Well, we have reduced a number of these assets to cash. *We have met with certain difficulties in reducing other of these accounts receivable to cash.*

Q. What assets remain outstanding that will be reduced to cash?

A. There are two assets that are outstanding at this time that will be reduced to cash. One is an amount of $1,843.76 that is owed by the Devore Construction Company. The money is being held and it will be turned over to us. *The other amount is an accounts receiveable owed by Allied Construction and Supply Company, which amount, I believe, will be settled subject to the approval of the court, of course, at an amount not to exceed $4,000.00.*

\* \* \* \* \*

Q. Now, counting the two items that will be received, the $4,000.00 account for Allied Building and Construction Company and the Devore Construction Company account, what will be the total amount of the assets reduced to cash?

A. $8,823.96. (Emphasis supplied.)

Thus, while the total assets reduced to cash amounted to slightly under $9,000.00, Amstan claimed a setoff based upon the total of the invoiced prices of the supplies

amounting to about $25,000.00. (*See* text, at 17.) It would appear, therefore, that the contract rights conferred by Amstan were of much less value to the estate than the invoiced total price. This is confirmed by further testimony of the trustee in response to cross-examination by Amstan's counsel:

Q. The $4,000.00 you said you expected to collect from Allied Construction Company, have you agreed yet on a compromise of that?

A. No, sir. That matter is still in the process of negotiation for final presentment to the court—subject to his approval.

\* \* \* \* \*

Q. I am interested in knowing whether or not that amount is before or after the mechanic's lien that has been filed against Allied Building Company by American Standard.

A. It was after.

\* \* \* \* \*

Q. And [the debt figure used by the trustee in calculating the total assets] excludes a number of disputed liabilities, does it not, sir?

A. Yes, sir.

58. As we pointed out in note 56, *supra*, the requirement of § 60, sub. c that the property "has become a part of the debtor's estate" would have been satisfied only when the goods were unconditionally transferred to the possession and control of the debtor.