**In re John R. FORD, II and Sarah A. Ford, Debtors.**

**Douglas J. WOLINSKY, Trustee of the Estate of John R. Ford, II and Sarah A. Ford, Plaintiff,**

**v.**

**CENTRAL VERMONT TEACHERS CREDIT UNION, Defendant.**

**Bankruptcy No. 88–00168.**
**Adv. No. 88–0043A.**

United States Bankruptcy Court, D. Vermont.

March 31, 1989.

---

8. The Advisory Committee Note to Rule 9006(f) states that "[s]ubdivision (f) is new and is the    same as F.R.Civ.P. 6(e)."

R. Brock, Cheney, Brock & Saudek, P.C., Montpelier, Vermont, for Cent. Vermont Teachers Credit Union (Credit Union).

G. Gebauer, Jr., Saxer, Anderson, Wolinsky & Sunshine, Burlington, Vermont, for trustee of the Estate of John R. Ford, II and Sarah A. Ford (trustee).

R. Obuchowski, Mayer, Berk & Obuchowski, South Royalton, Vt., for debtors.

## MEMORANDUM DECISION GRANTING TRUSTEE 11 USC § 547 RECOVERY OF PREFERENTIAL TRANSFER AND DENYING DEFENDANT'S REQUEST FOR SET-OFF UNDER 11 USC § 547(c)(4) [1]

FRANCIS G. CONRAD, Bankruptcy Judge.

The Trustee seeks to recover an alleged preferential transfer under 11 U.S.C. § 547(b) [2] from the Debtors to the Credit Union. The Credit Union does not dispute that it received a preferential transfer. The Credit Union's concession satisfies the Trustee's burden under 11 U.S.C. § 547(g) "of proving the avoidability of a transfer under subsection (b) of this section," *id.*, and establishes the elements of a prefer-

---

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general order of reference from the U.S. District Court of Vermont under VLBR 7012(a)(1). This proceeding is a core matter under 28 U.S.C. § 157(b)(2)(F). This Memorandum Decision constitutes findings of fact and conclusions of law under Rules of Practice and Procedure in Bankruptcy Rule 7052 which incorporates and makes applicable Fed.R.Civ.P. Rule 52 to adversary proceedings in bankruptcy, 11 U.S.C. §§ 101, *et seq.*

2. 11 U.S.C. § 547(b) *Preferences,* provides:

(b) Except as provided in subsection (c) of this section, the trustee may avoid any transfer of an interest of the debtor in property—

(1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made—

(A) on or within 90 days before the date of the filing of the petition; or

(B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5) that enables such creditor to receive more than such creditor would receive if—

(A) the case were a case under chapter 7 of this title;

(B) the transfer had not been made; and

(C) such creditor received payment of such debt to the extent provided by the provisions of this title ...

ential transfer under § 547(b) by the prerequisite preponderance of the evidence standard. See, *In re Thayer,* 38 B.R. 412, 421 (Bkrtcy.D.Vt.1984) ("The trustee bears the burden of establishing that a transfer constitutes a preference."); *Meyers v. Vermont National Bank (In re Music House, Inc.),* 11 B.R. 139, 140 (Bkrtcy.D.Vt.1980) ("The law places upon the trustee the unmistakable burden of proving by a fair preponderance of all the evidence every essential, controverted element resulting in the composite preference."). The Credit Union claims it is entitled to an off-set for "new value" under 11 U.S.C. § 547(c)(4)[3] that might have arisen but for its admitted unilateral failure to discover the existence of a potential statutory lien under 8 Vt. Stat.Ann. § 2071(d)[4] before deposit account sums were withdrawn post-petition by the Debtor and before the Trustee's § 547 preferential transfer complaint. We grant the Trustee's request for summary judgment on its § 547(b) preference action and deny the Credit Union's request for a § 547(c)(4) set-off.

### STATEMENT OF PROCEEDINGS

On December 6, 1988, the Trustee filed a "Complaint to Recover A Preferential Transfer" against the Credit Union and requested the return of $3,188.75 as a prepetition transfer: made within 90 days before the filing of an "involuntary" (sic— voluntary) petition; to an unsecured creditor; on account of an antecedent debt; and, if the transfer had not been made, which enabled the Credit Union to receive more than it would have been entitled to under Chapter 7 of the Bankruptcy Code, 11 U.S. C. §§ 101, *et seq.*

On December 8, 1988, we issued a "Preliminary Pre–Trial Order With Instructions" (VLBR Form No. 15) and a "Summons and Notice of Pre–Trial Conference," which together with the complaint were served by the Trustee upon the Debtor and the Credit Union.

On January 30, 1989, the Trustee filed a copy of the "Stipulation As To Facts" signed by the Trustee and the Credit Union. The Stipulation provided in pertinent parts:

3. Prior to filing the bankruptcy, the bankrupts had a debt of $2,378.58 with Central Vermont Teachers' Credit Union and a deposit account of $508.

4. On July 14, 1988, the debtor Sarah Ford appeared at the office of the Central Vermont Teachers' Credit Union and paid the entire $2,378.58 debt due.

5. On July 15, 1988, the Petition for relief under Chapter 7 in this matter was filed.

6. On September 7, 1988 the debtors withdrew the $508 from the existing deposit account.

7. On November 15, 1988 the trustee advised the Central Vermont Teachers' Credit Union of the potential problem and demanded return of the July 14, 1988 payment.

On January 30, 1989, Debtors' counsel filed a letter with the Court and represented the absence of an objection to the "Stipulation As To Facts," "[E]xcept for paragraph 7 which was outside of the Debtors' or their counsel's knowledge." Based on the representations of the parties that no further evidence or hearings were neces-

---

3. 11 U.S.C. § 547(c)(4) provides:
(c) The trustee may not avoid under this section a transfer—

   .    .    .    .    .

  (4) To or for the benefit of a creditor, to the extent that, after such transfer, such creditor gave new value to or for the benefit of the debtor—
  (A) not secured by an otherwise unavoidable security interest; and
  (B) on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor; ...

4. 8 Vt.Stat.Ann. § 2071(d) provides:
(d) The credit union shall have a lien on the shares, share certificates, deposits, deposits certificates and accumulate dividends or interest of a member in his individual or joint account, for any sum past due the credit union from said member or for any loan endorsed by him. The credit union shall also have a right of immediate set-off with respect to every such account. The members of the credit union shall not be personally or individually liable for the payment of its debts.

sary, the matter was taken under advisement.

## CLAIMS OF THE PARTIES

On January 26, 1989, the Credit Union filed their "Memorandum." They conceded that a preferential payment under 11 U.S. C. § 547 was given by the Debtors to the Credit Union and that the Trustee is entitled to an order for the return of $1,870.58. The $1,870.58 amount, the Credit Union argues, is the appropriate preference amount rather than the $2,378.58 amount the Trustee claims. The difference of $508.00 represents the proverbial "bone of contention" among the parties.

The Credit Union claims:

8 VSA § 2071(d) gives the credit union a lien in any deposits for unpaid debts. When the debtors withdrew that money ($508.00), the credit union did not realize that there was any 'unpaid debt' because of the payment which had been made on July 14th ($2,378.58). Had the credit union realized that the ($2,378.58) payment was preferential and would have to be returned, the credit union would not have allowed the withdrawal of the $508. Had they sought my (Credit Union's attorney) advice at that time, I would have recommended that they file a petition in reclamation to retain possession of the $508. Since they were unaware of the problem, however, they knew of no reason why they should not comply with the debtors' request for the money and they in fact released the money to the debtor (sic).

Offset of the $508 against the preference return is dictated by § 547(c)(4). . . . To the extent that the credit union released the $508 which it would not have released had it known it would have to return the July 14, 1988 payment, the transfer cannot be avoided. . . .

Credit Union's "Memorandum," pages 2–3 (parentheticals supplied for clarity).

In addition to the facts contained in the parties' "Stipulation As To Facts," the Trustee's "Memorandum In Support Of Trustee's Complaint To Recover A Preferential Transfer," filed January 30, 1989, requests that we take judicial notice of the following facts on record:

(b) On Schedule A–3 of said Petition (Debtors' Bankruptcy Petition filed July 15, 1988), the defendant (Credit Union) was listed as an unsecured creditor, with a claim in the amount of $3,188.75.

(c) All creditors listed on the Debtors' Petition, including the Defendant in this matter, were given notice of the filing by the Bankruptcy Court, said notice dated July 18, 1989 . . .

*Id.*, at pages 1–2 (parentheticals supplied for clarity).

The Trustee asserts that the Credit Union's statutory lien requires some form of possession. The Debtors' withdrawal of the funds from their deposit account destroyed any possession the Credit Union had, and thus terminated whatever lien the Credit Union may have had. As to the Credit Union's asserted ignorance, the Trustee argues that not only is causation of the lien's termination irrelevant, "this proposition ignores the fact that Defendant (Credit Union) knew that the payment to it occurred prior to the petition date, thus (it) was clearly a preference." *Id.*, at page 3 (parenthetical supplied for clarity).

As to the Credit Union's "new value" argument, the Trustee responds that this "is an inaccurate reading of the statute" and that:

In the case at bar, the Defendant (Credit Union) did not give new value to the Debtors estate. Rather, it allowed the Debtors access to funds which they already owned. The statute (11 U.S.C. § 547(c)(4)), then, will not benefit the defendant in this situation.

*Id.*, at page 3 (parenthetical supplied for clarity).

The Debtors' attorney adds by its letter filed January 31, 1989:

[T]he credit union had been listed as a creditor had been listed in the Debtors' schedules as originally filed on July 15, 1988. As such, the credit union had received notice of the bankruptcy filing, having been listed as creditor, and that their failure to recognize that the pay-

ment on July 14, 1988 was in the nature of a preference, was to their own dilemma. That same dilemma occurred upon the withdrawal and closing out of the account by the debtors on September 7, 1988.

*Id.,* page 1.

## ISSUE PRESENTED

Given the circumstance of a creditor's undisputed receipt of notice of a Chapter 7 filing, and its subsequent unilateral failure to assert a post-petition statutory possessory lien on a debtor's deposit account funds prior to its release of these funds to a debtor's possession, may a creditor's negligent forbearance from asserting such a lien constitute "new value" under 11 U.S.C. § 547(c)(4), which, in turn, would entitle the creditor to an offset against the receipt of an admitted pre-petition preferential transfer from the debtor?

## DISCUSSION

### A. Credit Union's Statutory Lien.

The Credit Union correctly acknowledges that it does not have a valid statutory lien

5. 8 Vt.Stat.Ann. § 2072, *Deposits,* is defined as: A credit union may accept deposits from its members in accordance with its bylaws.

6. 8 Vt.Stat.Ann. § 2055 *Membership,* provides in pertinent parts:
   (a) The membership of a credit union shall be limited to and consist of the subscribers to the articles of association and such other persons having the common bond set forth in the bylaws as have been duly admitted members, have paid the entrance fee as provided in the bylaws, have subscribed for one or more shares ... A member shall have all the rights and privileges of membership as long as he is in good standing.

7. 8 Vt.Stat.Ann. § 2074 *Joint accounts,* provides in pertinent parts:
   A member may designate any person or persons to hold shares, deposits, and special accounts with him in joint tenancy with the right of survivorship, but no joint tenant, unless a member in his own right, may be permitted to vote, obtain loans, or hold office or be required to pay an entrance fee. Payment of part or all of those accounts to any of the joint tenants shall, to the extent of the payment, discharge the liability to all....

8. 8 Vt.Stat.Ann. § 2054 provides for the *power* of the credit union to make loans:

on sums it had previously consented to be withdrawn by a depositor under 8 Vt.Stat. Ann. § 2071(d) (footnote 4 *supra* ).

The operative language of 8 Vt.Stat.Ann. § 2071(d) is: "The credit union *shall have a lien on ... deposits*[5] *...* of a *member*[6] *in his* individual or joint account,[7] *for any sum past due* the credit union *from said member or for any loan*[8] endorsed[9] by him. The credit union *shall* also *have a right of immediate set-off* with respect to every *such account." Id.,* (emphasis and footnotes ours).

In *Goodwin v. Barre Savings Bank & Trust,* 91 Vt. 228, 235–36, 100 A. 34, 37 (1917), a bankruptcy case, the Vermont Supreme Court held a banker had a common law merchant's lien on securities or funds which came into its possession in the regular course of business, and has the right to set off any matured debt against funds deposited without direction from its debtor and over the objections of a trustee in bankruptcy. See, *Goggin v. Bank of America Nat. Trust & Savings Ass'n.,* 183 F.2d 322, 324–25 (9th Cir.1950) *cert. denied,* 340 U.S. 877, 71 S.Ct. 122, 95 L.Ed.

A credit union may:

⋅ ⋅ ⋅ ⋅ ⋅

(7) Lend its funds to its members as herein provided; ... *Id.*

8 Vt.Stat.Ann. § 2078 *Loans to members,* provides in pertinent parts:
(a) A credit union may lend to members for such purpose and upon such security and terms as the bylaws may provide ... Every application for a loan shall be made in writing ... Every loan shall be evidenced by a written instrument.

⋅ ⋅ ⋅ ⋅ ⋅

(c) In addition to generally accepted types of security, the endorsement of a note by a guarantor or assignment of shares or wages, in a manner consistent with the laws of Vermont, shall be deemed security within the meaning of this chapter ...

⋅ ⋅ ⋅ ⋅ ⋅

(e) No director or member of the credit or supervisory committee may endorse for borrowers from the credit union, except in cases of immediate members of the family.

9. 8 Vt.Stat.Ann. § 2071(d) provides *inter alia* for the situation where the member had endorsed a loan for another member. As noted in footnote 8 *supra,* a credit union may only make loans to members.

637 (1950) *reh'g denied* 340 U.S. 898, 71 S.Ct. 237, 95 L.Ed. 651 (1950) (banker's statutory and common law lien extended to funds in its possession and debtor's bankruptcy could not affect these liens); see also, *Nutting v. Bradford National Bank (In re Nutting)*, 44 B.R. 233, 237 (Bkrtcy. D.Vt.1984) *dicta* (Court noted that proceeds from a certificate of deposit in the hands of a bank could be amenable to a common law set-off against a customer's matured indebtedness with the bank; however, the bank already held a security interest in the certificate of deposit itself. Thus a set-off based on a common law lien was not necessary to the Court's decision).

In *Katz v. First National Bank of Glen Head*, 568 F.2d 964 (2d Cir.1977) *cert. denied* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978), the Second Circuit noted an exception to the general rule that a pre-petition deposit in an unrestricted checking account made in the regular course of business is not a transfer within § 60 of the former Bankruptcy Act.

> It is well settled that deposits in an unrestricted checking account, made in the regular course of business, do not constitute transfers within the meaning of the Bankruptcy Act.... The theory of these cases is that a deposit creates a debt owed to a depositor by the bank and does not constitute a parting with property by the depositor.... Various irregularities might defeat that presumption ... Certainly when withdrawals are not permitted the deposits constitute payment.... But the fact that withdrawals *are permitted* does not make mandatory the opposite conclusion that the deposits cannot be considered transfers.

*Id.*, 568 F.2d at 969–70 (2d Cir.1977) (emphasis in original). The *Katz* Court reversed the District Court's narrow holding that, since the bank had obtained funds of the bankrupt by a set-off on funds on deposit in debtor's checking account prior to bankruptcy in conformity with § 68(a), (11 U.S.C. § 108(a) (11 U.S.C. § 553's predecessor)), there was no "transfer" that could be

avoided by the trustee. The *Katz* Court remanded to the District Court for a factual determination on the basis of the trustee's allegations that debtor's pre-petition deposits were not made in good faith or in the regular course of business, but rather were made by the debtor with the intention of leaving the deposits in the account for the banks' set-off.

We recently considered a pre-petition banker's lien in *In re Wildcat Construction Co., Inc.*, 57 B.R. 981 (Bkrtcy.D.Vt. 1986):

> Under Vermont law, the bank has a 'lien' on the funds of a customer that come into the bank's possession in the regular course of its business, 'and has the right to set off any matured debt against such funds without direction or authority from such customer.' *In re Nutting*, 44 B.R. 233, 237 (Bkrtcy.D.Vt.1984), *citing Goodwin, Trustee v. Barre Savings Bank & Trust*, 91 Vt. 228, 235, 100 A. 34 (1917). The leading case is *New York County National Bank v. Massey*, 192 U.S. 138, 24 S.Ct. 199, 48 L.Ed. 380 (1903); see also Loyd, The Development of Setoff, 64 University of Pennsylvania Law Review 541 (1916). The debtor is a creditor of the bank's (sic) to the extent of the funds on deposit. *Caledonia National Bank v. McPherson*, 116 Vt. 328, 330, 75 A.2d 685 (1950); see *In re Edgins*, 36 B.R. 480, 483, 10 C.B.C.2d 120 (Bkrtcy. 9th Cir.1984).

*Id.*, 57 B.R. at 982.

In *Wildcat*, we held that the filing of a Chapter 11 petition in Bankruptcy operates as a freeze on both the bank and the debtor-in-possession/depositor, i.e., a bank is prohibited from exercising an 11 U.S.C. § 553(a) set-off[10] without first obtaining an 11 U.S.C. §§ 362(a)(7) and 362(d) relief from stay order from the Bankruptcy Court. In turn, the debtor-in-possession must obtain either authorization from the Court or consent of the bank before drawing on accounts that the bank has lien rights in. *Id.*, 57 B.R. at 986.

---

**10.** We discuss *infra,* that a set-off under 11 U.S. C. § 553 is not to be confused with a set-off

under 11 U.S.C. § 547(c)(4).

Thus, like a common law banker's possessory lien, the Credit Union's statutory lien must meet the following conjunctive elements for perfection: 1) a loan from the banker/lender to a depositor/debtor; 2) the lender must have a legal or equitable right to sums in a depositor's/debtor's account; and, 3) there must be funds or securities on deposit in the subject account from which the banker/lender may withhold from the depositor/debtor.

The Credit Union, an unsecured creditor, made an erroneous assumption that no debt was due at the time it released the funds to the Debtors. The Credit Union should have known that Debtors' pre-petition transfer constituted a voidable preference under 11 U.S.C. § 547 after it received notice from the Bankruptcy Court of Debtors' bankruptcy. Moreover, the Credit Union should have governed its post-petition behavior according to this Court's recommendation in *Wildcat, i.e.,* seek leave of Court through relief from the automatic stay to lift a freeze on Debtors' deposit account to assert a set-off.

We hold that the Credit Union voluntarily surrendered possession of the funds to the Debtors. Under the circumstances, and as between the Debtors and the Credit Union only, such surrender constitutes the kind of consent required to lift the *Wildcat* freeze and permit Debtors' removal of the funds from the deposit account without leave of Court. We intimate no view on whether the Trustee should have requested a turnover of these funds from the Debtors as property of the estate.

An issue remains, however, whether the Credit Union's failure to preserve its post-petition statutory lien as a set-off against an admitted pre-petition preference may nevertheless constitute "new value" under § 547(a)(2) sufficient to meet the § 547(c)(4) set-off exception to a preferential transfer.

B. Preference Subsequently Off–Set By Unsecured Credit Under 11 U.S.C. § 547(c)(4).

1. *Dispelling the "Net Result" Myth.*

We begin by first determining the proper statutory construction to ferret out the meaning of the statute. Our search for legislative intent in every case involving statutory construction begins with the actual language. *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 756, 95 S.Ct. 1917, 1935, 44 L.Ed.2d 539, 561 (1975) (Powell, J., concurring: "The starting point in every case involving construction of a statute is the language itself."). *Accord, Landreth Timber Co. v. Landreth,* 471 U.S. 681, 685, 105 S.Ct. 2297, 2301–02, 85 L.Ed.2d 692, 696–97 (1985); *Burke Mountain Recreation, Inc. v. Vermont Development Credit Corporation* (In re Burke Mountain Recreation, Inc.), 64 B.R. 799, 802 (Bkrtcy.D.Vt.1986).

In the proceeding sub judice, we adopt the view that: "Our polestar ... must be the intent of Congress, and the guiding lights are the language, structure, and legislative history of [the act]." *Arizona Governing Comm. for Tax Deferred Annuity & Deferred Compensation Plans v. Norris,* 463 U.S. 1073, 1108, 103 S.Ct. 3492, 3511–3512, 77 L.Ed.2d 1236, 1264 (1983) (O'Connor, J., concurring).

When searching for legislative intent, we are mindful of Justice, now Chief Justice, Rehnquist's instruction on the appropriate source for legislative history:

In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation.' *Zuber v. Allen,* 396 U.S. 168, 186, 24 L.Ed.2d 345, 90 S.Ct. 314 [324] (1969). We have eschewed reliance on the passing comments of one Member, *Weinberger v. Rossi,* 456 U.S. 25, 35, 71 L.Ed.2d 715, 102 S.Ct. 1510 [1517] (1982), and casual statements from the floor debates. *United States v. O'Brien,* 391 U.S. 367, 385, 20 L.Ed.2d 672, 88 S.Ct. 1673 [1683] (1968); *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 64 L.Ed.2d 766, 100 S.Ct. 2051

[2056] (1980). In *O'Brien,* supra, at 385, 20 L.Ed.2d 672, 88 S.Ct. 1673, we stated that Committee Reports are 'more authoritative' than comments from the floor, and we expressed a similar preference in *Zuber,* supra, at 187, 24 L.Ed.2d 345, 90 S.Ct. 314 [325].

*Garcia v. United States,* 469 U.S. 70, 76, 105 S.Ct. 479, 483, 83 L.Ed.2d 472, 478 (1984).

The legislative history of 11 U.S.C. § 547(c)(4) provides us with an example of when appropriate statutory construction rules require us to disregard the statute's legislative history as misleading in order to carry out the expressed intention of the statute.

Section 547(c)(4)'s legislative history is as follows:

> *The forth exception codifies the net result rule in section 60c of current law.*[11] If the creditor and the debtor have more than one exchange during the 90–day period, the exchanges are netted out according to the formula in paragraph (4). Any new value that the creditor advances must be unsecured in order for it to qualify under this exception.

*Id.,* H.R.Rep. No. 95–595, 95th Cong., 1st Sess 374 (1977) *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6330. (Emphasis ours). The Senate Report is identical. S.Rep. No. 95–989, 95th Cong., 2d Sess. 88 (1978) reprinted in 1978 U.S.Code. Cong. & Ad.News 5874.

In *Pirie v. Chicago Title & Trust Co.,* 182 U.S. 438, 21 S.Ct. 906, 45 L.Ed. 1171 (1901), a 5–4 Decision, the Supreme Court applied a preference under the circumstance where the preference creditor was without knowledge of debtor's insolvency and without reasonable cause to believe debtor's payment was intended to be a preference. Nevertheless, the Supreme Court instructed the technical preference creditor to either retain its preference and forego allowance of its claim or return the preference and participate in a distribution with other creditors.

In *In re Bailey,* 110 F. 928 (D.Vt.1901), the District Court applied the technical preference of the former Bankruptcy Act where the bankrupt owed a grocery company $492.20, gave them a check for $287.00, and ordered $114.99 more goods. The $287.00 check was protested and not paid. The bankrupt thereafter paid $292.07 on account, leaving $790.28 due at the time of adjudication. The District Court held the $287.00 payment appeared to be a preference and had to be surrendered before proof of the claim. As for the creditor's argument of entitlement to a set-off under the Bankruptcy Act provision that if, after a preference, the creditor gives further credit for property which becomes a part of the estate, the new credit may be deducted from the preference to be surrendered, i.e., the new credit of $114.99 should be deducted from the preference payment of the $292.07, and proof allowed on surrender of the balance, the Court stated:

> This would be right if the check had constituted the preference; but it did not. The $292.07 did not pay the check, but was paid upon account, and the check was never paid. The situation was the same when this payment was made as if the check had never been drawn, for the debt covered the whole amount due, including that for which the check was given. The payment constituted the preference, and there was no new credit given afterwards for property that became a part of the estate. The whole payment must therefore be surrendered before proof can properly be allowed.

*In re Bailey,* 110 F. at 929 (D.Vt.1901).

The "net result" rule (formerly known as "running account" rule), evolved shortly after the enactment of the 1898 Bankrupt-

---

11. § 547(c)(4) was preceded by section 60c of the former Bankruptcy Act and was almost identical to subsection (c)(4):

(c) If a creditor has been preferred, and afterward in good faith gives the debtor further credit without security of any kind for property which becomes a part of the debtor's estate, the amount of such new credit remaining unpaid at the time of the adjudication in bankruptcy may be set of against the amount which would otherwise be recoverable from him.

11 U.S.C. § 96(c) (West 1968); 30 Stat. 562 (1898).

cy Act as a judicial response to decisions such as the *Pirie* case to rectify what was perceived to be inequities from the "technical" application of the 1898 Bankruptcy Act's preference section. *See, e.g., In re Sagor & Brother,* 121 F. 658 (2d Cir.1903); *Kimball v. E.A. Rosenham Co.,* 114 F. 85, 88–89 (8th Cir.1902).

The judicially created "net result" exception to a technical preference was adopted by the United States Supreme Court in *Jaquith v. Alden,* 189 U.S. 78, 83, 23 S.Ct. 649, 651, 47 L.Ed. 717 (1903) ("payments on a running account, where new sales succeed payments and the net result is to increase the value of the estate, do not constitute preferential transfer under section 60a."), and reaffirmed in *Yaple v. Dahl–Millikan Grocery Co.,* 193 U.S. 526, 24 S.Ct. 552, 48 L.Ed. 776 (1904) and *Joseph Wild & Co. v. Provident Life & Trust Co.,* 214 U.S. 292, 29 S.Ct. 619, 53 L.Ed. 1003 (1909).

Since *Jaquith,* Courts have expressed their discomfort with the continued vitality of the "net result" rule. For example, the Court in *Campanella v. Liebowitz,* 103 F.2d 252, 253 (3d Cir.1939), noted the "running account" defense was historically designed by Courts to immunize creditors who, in good faith and without knowledge of insolvency, received technical preference payments. After the 1903 amendment to the Bankruptcy Act,[12] this defense did not survive because the Supreme Court did not intend to exempt a creditor from preference liability where the creditor had knowledge or reason to believe the payments were preferred. Other Courts such as *Cooper Petroleum Co. v. Hart,* 379 F.2d 777, 781 (5th Cir.1967), distinguished the "running account" rule as "simply inapplicable" where a "creditor accepting payments on open account is found to have had reason to believe the debtor ... insolvent."

Dissatisfaction with the "running account" or "net result" rule was expressed by Judge L. Hand in *Wilcox v. Goess,* 92 F.2d 8 (2d Cir.1937) *cert. denied* 303 U.S. 647, 58 S.Ct. 646, 82 L.Ed. 1108 (1938):

[I]t is true that at times when the debtor and the creditor have had a running merchandise account, begun after the debtor is insolvent, and ending in an enrichment of the estate, payments made upon the account are not treated as preferences. *Jaquith v. Alden,* 189 U.S. 78 [23 S.Ct. 649, 47 L.Ed. 717] (1903); *Yaple v. Dahl–Millikan Grocery Co.,* 193 U.S. 526 [24 S.Ct. 552, 48 L.Ed. 776] (1904); *Joseph Wild & Co. v. Provident Life & Trust Co.,* 214 U.S. 292 [29 S.Ct. 619, 53 L.Ed. 1003] (1909); *In re Fred Stern & Co.,* 54 F.2d 478 (2d Cir.1931). The doctrine is somewhat anomalous at best, and can be defended in principle only by the fiction of treating all items of the account as one and the payment as therefore subject to set-off of the dividends payable on all. *Id.,* 92 F.2d at 12 (2d Cir.1937).

More recently, the Second Circuit in *Bernstein v. Alpha Associates, Inc. (In re Frigtemp Corp.),* 753 F.2d 230 (2d Cir. 1985), reviewed cases where the running account defense had been applied and criticized their decisions in *Federal International Banking Co. v. Childs (In re Fred Stern & Co. Inc.), supra,* 54 F.2d 478, 481 (2d Cir.1931) (L. Hand, J., concurring: "I am not sure that I understand on what principle those cases rest, but I cannot distinguish them on the facts.") and *In re Sagor & Brother, supra,* 121 F. 658 (2d Cir.1903), as cases where the "running account" defense "have been aptly called 'confusing.'"

The *Frigtemp* Court also found their *Stern* and *Sagor* decisions distinguishable for their apparent reliance on the creditor's lack of notice of a debtor's insolvency. *Id.,* 753 F.2d at 234. The *Frigtemp* Court, however, refused an opportunity to factually distinguish the "running account" or "net result" rule to salvage the "net result" preference exception. *Frigtemp* sided with the majority of Courts to hold the "net result" rule is no longer viable as a defense to avoid a preference after 1903.

Every Court that has squarely considered the appellants' argument ("run-

---

**12.** In 1903 Congress amended old Section 57(g) of the Bankruptcy act, reducing its application to void or voidable preferences. Ch. 487, § 12(g), 32 Stat. 799 (1903).

ning account" defense) has rejected it and has ruled that the defense 'disappeared' in 1903. . . . We are not persuaded to break with this line of authority ... Because we agree with the determination of the District Court that the running account defense was no longer available after 1903, the defense may not be relied upon by the appellants in this case.

*Id.,* 753 F.2d at 233–34 (2d Cir.1985). *Accord, Thomas W. Garland Inc. v. Union Elec. Co. (In re Thomas Garland, Inc.),* 19 B.R. 920, 925–26 (Bkrtcy.E.D.Mo.1982) (excellent summary on the historical development of the "net result" rule and concludes the 1903 amendment eliminated the "theoretical foundation" for the "running account" rule). *See, Report of the Commission on the Bankruptcy Laws of the United States,* H.R.Doc. No. 137, pt. I, 93d Cong., 1st Sess., 210–11 (1973) ("The Commission's recommendation does not, however, go as far as the 'net result rule' established by some early cases. A true 'net result' rule would total all payments and all advances and offset the one against the other. This is not allowed under the Commission's recommendation, since the advance to be offset must be subsequent to the preference.").

In *Waldschmidt v. Ranier (In re Fulghum Construction Corp.), infra,* 706 F.2d 171 (6th Cir.1983) cert. denied 464 U.S. 935, 104 S.Ct. 342, 78 L.Ed.2d 310 (1983) the Court applied a form of statutory construction that required the "net result" rule be confined to the more circumscribed Congressional formula under § 547(c)(4) because "[a]s an equitable doctrine its application, of necessity, must 'comport to and remain compatible with the prevailing legislative intent.'" *Id.,* 706 F.2d at 173. Accord, *McClendon v. Cal–Wood Door (In re Wadsworth Bldg. Components, Inc.),* 711 F.2d 122, 124 (9th Cir.1983) ("It is clear that Congress intended § 547(c)(4) to be the exclusive net result rule under the Code."); *Leathers v. Prime Leather Finishes Co.,* 40 B.R. 248, 251, 252 (D.Me.1984) ("In summary, the Court finds that the judicially created net result rule has no vitality in

light of § 547(c)(4) of the Bankruptcy Code.").

We concur with the *Frigtemp* and *Waldschmidt* decisions and respectfully disregard the misleading conclusion stated by the legislative history of § 547(c)(4) in so far as "[t]he forth exception codifies the net result rule in section 60c of current law," because that section did not codify the "net result" rule.

A leading commentator aptly rings the death knell of the judicial "net result" exception to a preferential transfer:

In fact, no 'net result' rule has existed since 1903, and the rule never was applicable to old section 60c. The rule developed when old section 57g required creditors to surrender 'technical' preferences, which were not voidable because the creditor had no reasonable cause to believe the debtor insolvent, before their claims would be allowed. To mitigate the rigors of section 57g, lower courts developed, and the Supreme Court approved, a 'net result' rule under which all 'technical,' nonvoidable preferences received by a creditor and all unsecured credit extended by that creditor during the then four month preference period were viewed as a single transaction. Only to the extent that the 'net result' showed a gain by the creditor would the creditor be required to surrender it before his claim would be allowed. Courts, however, applied that rule only under section 57g and only to creditors who had received nonvoidable preferences; the rule did not apply to creditors who received preferences that the trustee could avoid under old section 60. Those creditors might have been able to set off subsequent unsecured credit extensions under section 60c, but they could not invoke the 'net result' rule. When Congress amended section 57g in 1903 to confine its operation to voidable preferences, there was no longer any occasion to apply the 'net result' rule. Every court that has considered the effect of the amendment of 57g on the 'net result' rule has reached this conclusion.

Countryman, *The Concept of a Voidable Preference in Bankruptcy,* 38 Vand.L. Rev. 713, 783 (1985) (footnotes omitted).

## 2. *Subsequent Advance Rule.*

■ The Sixth Circuit's decision in *Waldschmidt v. Ranier (In re Fulghum Construction Corp.), supra,* 706 F.2d at 173–174, is representative of the majority's position that § 547(c)(4) is more appropriately called the "subsequent advance" rule:

Congressional metamorphosis has transformed the judicially created net result rule into what may be characterized as a subsequent advance rule and has codified this augmented version into § 547(c)(4) ... Section 547(b) deliberately defines a preference as a 'transfer,' rather than as an aggregate of transfers or netting of transactions between the creditor and the debtor, and § 547(c) artfully articulates equitable 'defenses' whereby the trustee may be foreclosed from avoiding the preference. In particular, § 547(c)(4) permits a netting procedure to be applied when the debtor and creditor are both recipients and initiators of transactions. Construed in pari materia, § 547(b) and (c) disclose a calculated legislative scheme and intent to implement equitable considerations which the judiciary at the turn of this century adjudged as lacking and responded by evolving the net result rule. This legislative response reflected in the promulgation of § 547(b) and particularly § 547(c)(4) mirror the congressional version of equitable principles, expressed as the subsequent advance rule, to be incorporated into the 1978 revision of the Bankruptcy Act.

*Id.,* 706 F.2d at 174 (6th Cir.1983) (vacated District Court's application of the judicial net result rule to § 547(b)(5) as "A 'judicial gloss' which significantly restricts the statutory definition of 'preference' and pragmatically emasculates the creditor (sic) defense thereto as intended by Congress in § 547(c)(4) constitutes nothing less than legislation by judicial decree." *Id.,* at 173.).

Given the sparse and misleading legislative history of § 547(c)(4), the Eight Circuit recently adopted the Bankruptcy Court's summary on the policy behind the "subse-

quent advance" rule in *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 850 F.2d 1275 (8th Cir.1988):

The general avoidance portion of the Bankruptcy Code was intended to 'facilitate the prime bankruptcy policy of equality of distribution among creditors of the debtor.' H.R.Rep. No. 595, 95th Cong., 1st Sess., *reprinted in* 1978 U.S. Code Cong. & Admin. News 5787, 5963, 6138. Nevertheless, the subsequent advance rule, section 547(c)(4), 'was not enacted to ensure equitable treatment of creditors, but rather is intended to encourage creditors to deal with troubled businesses.' *Chaitman v. Paisano Automotive Liquids, Inc.* (In re Almarc), 62 B.R. 684, 687–88 (Bankr.N.D.Ill.1986) (footnote omitted); see also *Gold Coast Seed Co. v. Spokane Seed Co. (In re Gold Coast Seed Co.),* 30 B.R. 551, 553 (9th Cir.1983) ('the purpose of § 547(c)(4) is precisely to encourage trade creditors to continue dealing with troubled businesses.') As the bankruptcy court [*Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.),* 56 B.R. 339 (Bkrtcy.D.Minn. 1985)] cogently stated, the trustee

misstates the policy behind the subsequent advance rule, though, by suggesting that the test is whether a new value advance makes available additional assets for distribution to creditors. The clear intent of Congress is that new value advanced by creditors should be available to debtors in the conduct of their business. Consequently, a debtor's purchase of supplies or payment of employee salaries and other expenses with new value received is the fully anticipated result of a new value advance, even though the immediate effect of such may be to temporarily expend funds otherwise available for distribution....

56 B.R. at 393.

*Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft*

*Corp.), supra,* 850 F.2d at 1280 (8th Cir. 1988).

Collier describes this exception:

The key difference between the net result rule and section 547(c)(4) is that the former ignores the timing of the creditor's advances to the debtor, and permits the creditor to net *all* transfers during the preference period. Section 547(c)(4), on the other hand, with its requirement that the creditor's transfer be *subsequent* to the debtor's preferential payments, is obviously less favorable to the creditor who keeps running accounts with the debtor.

4 Collier on Bankruptcy § 547.12 at 547–52 (15 Ed.1988) (emphasis in original). *Accord, Waldschmidt v. Ranier (In re Fulghum Construction Corp.), supra,* 706 F.2d at 173 ("[T]he subsequent advance rule of § 547(c)(4) ... forecloses avoidance of the transfer by the trustee only if the creditor provides additional value after the transfer from the debtor to the creditor." *Id.,* (emphasis in original)); *Excel Enterprises, Inc. v. Sikes, Gardes & Co. (In re Excel Enterprises, Inc.),* 83 B.R. 427, 432 (Bkrtcy.W.D. La.1988) (creditor not entitled to credit under § 547(c)(4) for services rendered before preferential payments).

For § 547(c)(4) to be applicable to a creditor found to have received a preferential transfer under § 547(b), three elements of the "subsequent advance rule" must be met: a) the creditor must have extended new value to the debtor or on debtor's behalf after receiving the preference; b) the new value must be unsecured; and, c) the new value must remain unpaid after its transfer. *Accord, Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.),* 841 F.2d 1082, 1083 (11th Cir.1988); *Matter of Prescott,* 805 F.2d 719, 731 (7th Cir.1986); *Remes v. Consumers Power Co. (In re Camelot Motors Corp.),* 86 B.R. 520, 522 (Bkrtcy.W.D.Mich.1988); *Chaitman v. Paisano Automotive Liquids, Inc. (In re Almarc),* 62 B.R. 684, 686 (Bkrtcy.N.D.Ill.

1986); *Erman v. Armco, Inc. (Matter of Formed Tubes, Inc.),* 46 B.R. 645, 646 (Bkrtcy.E.D.Mich.1985); *Rovzar v. Golten Ship Repair, Inc. (In re Saco Local Development Corp.),* 30 B.R. 862, 866 (Bkrtcy.D. Me.1983); *Pettigrew v. Trust Company Bank (Matter of Bishop),* 17 B.R. 180, 183 (Bkrtcy.N.D.Ga.1982).

The burden of proving the affirmative defense of nonavoidability of a preferential transfer under 11 U.S.C. § 547(c)(4) falls on the creditor by virtue of 11 U.S.C. § 547(g) which provides in pertinent parts:

[T]he creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section.

*Id.* Accord, *Air Vermont, Inc. v. Northland Construction, Inc. (In re Air Vermont, Inc.),* 47 B.R. 537, 539 (Bkrtcy.D.Vt. 1985); *Begier v. Airtech Services, Inc. (In re American Intern. Airways, Inc.),* 56 B.R. 551, 553 (Bkrtcy.E.D.Pa.1986) (Court held creditor failed its burden by less than preponderance of the evidence, and held "as a matter of law that the defendant is not entitled to offset against the claimed preferential transfers any new value which was subsequently paid for by the debtor." *Id.,* 56 B.R. at 555); *see, Matter of Prescott,* 805 F.2d 719, 728 (7th Cir.1986) (a pre-BAFJA case prior to the 1984 amendment adding § 547(g), held that a creditor has burden of proving the "subsequent advance" defense).

■ The creditor's state of mind in making the post-preferential advance is absolutely irrelevant to the right of set-off under § 547(c)(4). *See, In re Hygrade Envelope Corp.,* 393 F.2d 60 (2d Cir.1968) *cert. denied* 393 U.S. 837, 89 S.Ct. 114, 21 L.Ed.2d 108 (1968).

A preferential transfer will not be recognized to the extent that the transferee, after the transfer,[13] gives "new value" to the debtor on an unsecured basis.

---

13. 11 U.S.C. § 101(50) defines "transfer:" 'transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption ...

"New value" for purposes of § 547 of the Bankruptcy Code is defined as:

(2) "New value" means money or money's worth in goods, services, or new credit, or release by a transferee of property of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

11 U.S.C. § 547(a)(2).

The Seventh Circuit in *Matter of Prescott*, 805 F.2d 719 (7th Cir.1986), explained the theory behind "new value" as:

[T]he theory behind the 'subsequent advance' exception to the trustee's avoiding power is that to the extent unsecured new value is given to the debtor after a preferential transfer is made, the preference is repaid to the bankruptcy estate.

*Id.*, 805 F.2d at 731).

In *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.)*, 841 F.2d 1082 (11th Cir.1988), the Eleventh Circuit recently stated:

A subsequent advance is excepted because it is reasoned that a creditor who contributes new value in return for payments from the incipient bankrupt, should not later be deemed to have depleted the estate to the disadvantage of other creditors.

*Id.*, 841 F.2d at 1083.

■ The "new value" extended must be unsecured, not that the creditor in general be unsecured:

However, if the creditor obtains a security interest to secure payment of the new value or is paid for the new value by the

debtor, there is in effect no return of the preference and the section 547(c)(4) defense is not available to the creditor. *Erman v. Armco, Inc. (Matter of Formed Tubes, Inc.), supra,* 46 B.R. 645, 647 (Bkrtcy.E.D.Mich.1985). *Accord, Matter of Prescott, supra,* 805 F.2d at 731–32 (7th Cir.1986). *See also, Begier v. Airtech Services, Inc. (In re American Intern. Airways, Inc.), supra,* 56 B.R. 551, 554 (Bkrtcy.E.D.Pa.1986) ("[T]he overwhelming majority of courts hold directly opposite the holding in *Isis Foods [Valley Candle Mfg. Co. v. Stonitsch (Matter of Isis Foods, Inc.)*, 39 B.R. 645, 653 (W.D.Mo. 1984)], that is the new value must go unpaid in order for § 547(c)(4) to apply...." (citations omitted)); *Global International Airways Corp. v. Evergreen Air Center, Inc. (Matter of Global Intern. Airways Corp.),* 80 B.R. 990 at 992 n. 4 (Bkrtcy.W. D.Mo.1987) ("The rule of *Matter of Isis Foods, Inc.,* 39 B.R. 645 (W.D.Mo.1983 (sic 1984)), that the subsequent value may have been paid for and still meet the requirements of § 547(c)(4), seems contrary to common sense and the clear intent of the statute and has been rejected by subsequent authority."). *But see, Peter J. Saker, Inc. v. Allied Design Corp. (In re Pauler Saker & Co., Inc.),* 53 B.R. 630, 634 (Bkrtcy.S.D.N.Y.1985) (adopts the minority position of *Isis Foods, supra* that there is no requirement that the advance of new value remain unpaid).

Bankruptcy Judge Schwartzberg reminds us of yet another distinction between the "subsequent advance" rule and the former "net result" rule when it comes to ascertaining "new value:"

Thus, only preferential transfers made by the debtor before the new value was given may be netted out against the sub-

---

*Id.* Deposits into bank accounts can be transfers. As the Senate Report stated: "The definition of transfer is as broad as possible.... A deposit in a bank account or similar account is a transfer." S.Rep.No. 989, 95th Cong., 2d Sess. 27, *reprinted in* 1978 U.S.Code Cong. & Admin. News, 5787, 5813. *Accord,* H.Rep.No. 95–595, 95th Cong., 1st Sess. 314 (1977). However, a deposit into an unrestricted checking account, made in the regular course of business and withdrawable at the will of the depositor "do

not constitute transfers within the meaning of the Bankruptcy Act." *Katz v. First National Bank of Glen Head,* 568 F.2d 964, 969 (2d Cir. 1977) *cert. denied* 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978); *Miller v. Wells Fargo Bank Intern. Corp.,* 406 F.Supp. 452, 467 (S.D.N. Y.1975) aff'd *Miller v. Wells Fargo Bank Intern. Corp.,* 540 F.2d 548, 557 (2d Cir.1976); *Matter of Prescott, infra,* 805 F.2d 719, 729 (7th Cir.1986) *citing, Redmond v. Tuttle,* 698 F.2d 414, 417 n. 8 (10th Cir.1983).

sequent new value. However, preferential payments following receipt of new value are not netted against the new value. Thus, the net result rule does not apply to the 90 day preference period as a whole; each transfer must be examined independently to determine whether or not the creditor later replenished the estate.

*In re Rustia,* 20 B.R. 131, 135 (Bkrtcy.S.D. N.Y.1982).

As we indicated in footnote 11 *supra,* counsel should also be aware that § 547(c)(4) must not be confused with § 553 when dealing with set-off.

In both instances, setoffs are allowed only for debts and credits which arise *prior* to the bankruptcy petition.... I conclude that the language of § 547(c)(4) is not an adequate basis for allowing a prepetition preference to be offset by post petition new value. 'Section 553, similar to old Bankruptcy Act § 68, allows setoffs of mutual debts and credits which arise under *non-bankruptcy* law *prior* to a bankruptcy petition. Section 547(c)(4), on the other hand, creates under *bankruptcy* law a right of a setoff limited to the preference area.' Kaye, "Preferences Under the New Bankruptcy Code," 54 Amer.Bank.L.J. 197, 206 (1980) (emphasis in original). I conclude that the language of § 547(c)(4) is not an adequate basis for allowing a prepetition preference to be offset by postpetition new value.

*Century Brass Products, Inc. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Matter of Century Brass Products, Inc.),* 71 B.R. 77, 79 (Bkrtcy.D. Conn.1987) (emphasis in original). *Accord, Columbia Packing Company v. Allied Container Corp. (In re Columbia Packing Company),* 44 B.R. 613 (Bkrtcy.D. Mass.1984) ("... he is stretching the language of 11 U.S.C. § 547(c)(4) by digging his adversaries into a time warp through § 60c of the 1898 Act.... The preference cases cited by the debtor that make use of the term 'setoff,' do not seek to use the term as a work of art with the technical meaning of setoff as utilized in 11 U.S.C.

§ 553 of the Code.... Under § 547(c)(4), there is nothing to setoff since there is simply no *preference* to the extent that new unsecured value is given." *Id.,* 44 B.R. at 614; footnote omitted; emphasis in original).

In determining whether a creditor has extended "new value," the focus is not on the harm or detriment to the creditor, but rather the issue before the Court is whether there is an augmentation or material benefit to the debtor's estate. *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.),* 68 B.R. 596, 602 (S.D.Fla.1986) aff'd per curiam *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.), supra* 841 F.2d 1082 (11th Cir.1988).

Under the former Bankruptcy Act, 11 U.S.C. § 96(c), Courts would approach the consideration problem of what constituted "credit ... for property that becomes part of the debtor's estate," by an examination of whether or not "... the bankrupt estate has been enhanced to the extent of the property added by the creditor...." *American Standard, Inc. v. Nass (In re Jack Kardow Plumbing Co.),* 451 F.2d 123, 138 (5th Cir.1971). *See, Kaufman v. Tredway,* 195 U.S. 271, 274–75, 25 S.Ct. 33, 34, 49 L.Ed. 190 (1904) (Court held § 60c did not require that the money or property remain in the "debtor's estate" during bankruptcy in order to become part of the bankruptcy estate, and that the now obsolete "good faith" requirement required only that the creditor "let the debtor have the money or property for some honest purpose...." *Id* ).

The Second Circuit expanded the definition of consideration for "property" under § 60c to reach intangibles such as legal or accounting services rendered as qualified for a set-off against prior preference payments. *Kamerman & Kamerman v. Seligson (In re Ira Haupt & Co.),* 424 F.2d 722, 724 (2d Cir.1970) *citing Kass v. Doyle,* 275 F.2d 258, 262 (2d Cir.1960).

After the preferential transfer, any consideration that fits into the definition of

"new value" under § 547(a)(2) will qualify under § 547(c)(4), for example:

> The section embraces new credit used, *Buys of Jericho, Inc.*, 22 B.R. 1013 (Bankr.S.D.N.Y.1982), utility service provided, *In re Thomas W. Garland, Inc.*, 19 B.R. 920 (Bankr.E.D.Mo.1982), services performed, *In re Saco Local Development Corp.*, 25 B.R. 880 (Bankr.D.Me. 1982), or any 'money or money's worth in goods, services or new credit," § 547(a)(2); *In re Rustia*, 20 B.R. 131 (Bankr.S.D.N.Y.1982).

*Air Vermont, Inc. v. Northland Construction, Inc. (In re Air Vermont, Inc.)*, 47 B.R. 537, 539 (Bkrtcy.D.Vt.1985). In *Air Vermont* we held that a construction company that received a preferential transfer from debtor airline company in payment for construction work on airport counter completed more than 45 days prior to payment, was not entitled to set-off against debtor's recovery of preference transfer for expenses incurred in connection with a separate contract to modify an airport hanger prior to preferential transfer.

■ There is an emerging trend that departs from earlier decisions such as *Thomas W. Garland v. Nooney Company (In re Thomas W. Garland, Inc.)*, 28 B.R. 87 (Bkrtcy.E.D.Mo.1983) and *In re Quality Plastics, Inc.*, 41 B.R. 241 (Bankr.W.D. Mich.1984). The trend shows post-petition subsequent advances will not qualify for the "new value" exception under § 547(c)(4). The rationale behind this trend is that once a petition is filed, Courts must keep intact the mechanism established by Congress for control over the destiny of a debtor's estate:

> The purpose of the subsequent advance rule or new value rule under § 547(c)(4) is to encourage creditors to continue to deal with troubled businesses. Once a bankruptcy petition is filed, however, other sections of the Code provide protection to parties advancing credit. For example, § 364 provides mechanisms for secured and unsecured lending to the debtor-in-possession. The problem with allowing post-petition advances to be freely offset against otherwise avoidable preferences is that no mutuality of debt

exists and control of the finances of the estate is taken out of the hands of the Court and fiduciaries for the estate and placed in the hands of a single creditor who is hostile to the overall interests of the estate and its creditors. To permit such offsets notwithstanding possible prejudice to other creditors would ignore the orderly mechanism established by Congress to protect all interested parties concerned.'

*Jet Florida Systems, Inc. v. Eastern Air Lines, Inc. (In re Jet Florida Systems, Inc.)*, 59 B.R. 886, 890 (Bkrtcy.S.D.Fla. 1986) quoting *Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 56 B.R. 339, 396–97 (Bkrtcy.D.Minn.1985). *Accord, Bergquist v. Anderson–Greenwood Aviation Corp. (In re Bellanca Aircraft Corp.)*, 850 F.2d 1275, 1284–85 (8th Cir.1988) (affirmed and adopted the Bankruptcy Court's policy reasoning for rejecting a creditor's argument that: "the section 547(c)(4) defense will not be served unless it is permitted new value setoffs for post-petition advances."); *Century Brass Products, Inc. v. International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Matter of Century Brass Products, Inc.)*, *supra*, 71 B.R. 77, 79 (Bkrtcy.D. Conn.1987).

We agree with the *Bellanca* and *Jet Florida* Courts that post-petition advances will not constitute new value under § 547(a)(2) for § 547(c)(4)'s off-set purposes in defense of a preferential transfer. In the proceeding *sub judice*, the Credit Union's post-petition action or inaction may not be used as "new value" under § 547(a)(2) for the purposes of establishing the "subsequent advance" rule as an affirmative defense to offset a pre-petition preferential transfer under § 547(c)(4).

■ There is yet another ground that prevents the Credit Union, an unsecured creditor, from misusing the affirmative defense of § 547(c)(4); namely, we are of the view that forbearance, whether consensual/nonconsensual, direct/indirect, unilateral/bilateral, or intentional/unintentional,

may not constitute new value under § 547(a)(2) for § 547(c)(4) purposes.

In truth, then, the question whether forbearance by itself can constitute new value is at the heart of this controversy. A number of courts have addressed the issue and have reached opposite results. *Compare In re Quality Plastics, Inc.,* 41 B.R. 241 (Bankr.W.D.Mich.1984) (officer-creditor's forbearance constituted new value); *In re Rustia,* 20 B.R. 131, 134 (Bankr.S.D.N.Y.1982) (creditor's restoration of available line of credit upon credit card holder's repayment not equivalent to giving new value by actual extension of new credit); *In re Duffy,* 3 B.R. 263 (Bankr.S.D.N.Y.1980) (creditor's forbearance did not constitute new value).... We conclude that it cannot. We think it plain that a payment to an *unsecured* creditor in return for that creditor's agreement not to force the debtor into bankruptcy can never be treated as new value. Otherwise the preference provisions of the bankruptcy code would be nullified, because all creditors could extract payments within the preference period under that exception. Similarly, an agreement by an *undersecured* creditor to forgo his right to foreclose on collateral could not be treated as new value without unfairly prejudicing general creditors. It is a basic axiom of bankruptcy law that a secured creditor is protected only to the extent of his security interest. If an agreement not to foreclose-to forbear- were treated as new value, however, then a debtor's payment of the entire debt (both secured and unsecured portions) in return for that agreement could be sheltered from the Code's preference provisions. The undersecured creditor, in other words, could leverage his security to cover the unsecured portion of the debt....

*Drabkin v. A.I. Credit Corporation,* 800 F.2d 1153, 1158–59 (D.C.Cir.1986) (footnotes omitted). *Accord Chase Manhattan Bank, N.A. v. Dent. (In re Trans Air, Inc.),* 78 B.R. 351, 354 (Bkrtcy.S.D.Fla. 1987). See *Charisma Investment Company, N.V. v. Airport Systems, Inc. (In re Jet Florida System, Inc.), supra* 841 F.2d 1082, 1084 (11th Cir.1988) (lessor's forbearance in termination of lease following debtor's default did not constitute § 547(a)(2) "new value" for purposes of § 547(c)(4) "subsequent advance" exception to preferential transfer because the debtor did not use the premises); *American Bank of Martin County v. Leasing Service Corporation (In re Air Conditioning, Inc. Of Stuart),* 845 F.2d 293, 298 (11th Cir.1988) cert. denied *First Interstate Credit Alliance, Inc. v. American Bank of Martin County,* —— U.S. ——, 109 S.Ct. 557, 102 L.Ed.2d 584 (1988).

## CONCLUSION

The Trustee's request for summary judgment is granted because the Credit Union's concession satisfies the Trustee's burden under 11 U.S.C. § 547(g) "of proving the avoidability of a transfer under subsection (b) of this section," *id.;* and establishes the elements of a preferential transfer under § 547(b) by the prerequisite preponderance of the evidence standard.

We reject the Credit Union's assertion that their post-petition failure, *albeit* their unilateral ignorance or negligence, to assert a statutory lien on sums in Debtors' deposit account, before the sums were withdrawn by the Debtor and before the Trustee brought a preference action for the return of Debtors' pre-petition payment to the Credit Union, constitutes new value under § 547(a)(2) for purposes of an off-set under § 547(c)(4).

We hold that the Credit Union's post-petition action or inaction does not constitute "new value" under § 547(a)(2) for the purposes of establishing the "subsequent advance" rule as an affirmative defense to offset a pre-petition preferential transfer under § 547(c)(4).

Lastly, we are of the view that mere forbearance, whether consensual/nonconsensual, direct/indirect, unilateral/bilateral, or intentional/unintentional, may not constitute new value under § 547(a)(2) for § 547(c)(4) purposes.